[Cite as *Brammer v. Brammer*, 194 Ohio App.3d 240, 2011-Ohio-2610.]

## IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## MARION COUNTY


BRAMMER,

     APPELLANT,
                                      CASE NO.  9-10-49

     v.

BRAMMER,
                                         O P I N I O N

     APPELLEE.


**Appeal from Marion County Common Pleas Court**
**Family  Division**
**Trial Court No. 06 DR 119**

**Judgment Reversed and Cause Remanded**

**Date of Decision:  May 31, 2011**


**APPEARANCES:**

     Ted I. Coulter, for appellant.

     Kevin P. Collins, for appellee.

**SHAW, Judge.**

{¶1} Appellant, Vance Brammer, appeals the August 19, 2010 judgment of the Marion County Court of Common Pleas, Family Division, modifying the parties' shared-parenting plan to designate appellee, Shannon Brammer, as residential parent of the parties' children for school purposes.

{¶2} The parties were married on August 28, 1998, and had two children together: Hayden, born in October 2000 and Keegan, born in June 2003. The parties divorced in 2006, and a joint shared-parenting plan was put into effect in which both parents exercised equal parenting time. Pursuant to the shared-parenting plan, each parent was designated the residential and custodial parent of the children during their individual periods of parenting time. The shared-parenting plan also specified that the children attend school in the River Valley School District unless the parties agreed to change school districts by mutual consent.

{¶3} On January 19, 2010, Shannon filed a motion to modify parental rights and responsibilities. In support of her motion, Shannon asserted that a change in circumstances had occurred because she recently received a job promotion and intended to relocate to Tennessee, where her fiancé and his children resided.

{¶4} On February 12, 2010, the trial court referred the matter to the family-services coordinators pursuant to R.C. 3109.04(C) and Civ.R. 75(D) and ordered a review of the case to be conducted and a report issued.

{¶5} On February 23, 2010, Vance filed a motion to modify parental rights and responsibilities, asserting that it is in the best interests of the children to remain in Ohio.

{¶6} On May 14, 2010, the family-services coordinator assigned to the case, Ken Warren, submitted his report to the trial court. Warren met with Shannon, Vance, and both children while conducting his review. In his report, Warren stated that both parents are "capable and are in fact providing good homes for their children." Warren further noted that a primary contention between the parties was whether their youngest, Keegan, would receive adequate attention for his special-education needs in River Valley schools.[1] Specifically, Vance indicated that if he were to be named the residential parent for school purposes, he would keep the children in River Valley schools, where they had begun to develop strategies from multiple resources to assist Keegan with his special-education needs. Shannon, on the other hand, expressed to Warren that she intended to place

___

[1] Keegan was diagnosed earlier that year with Tourette 's syndrome.

the children in an elementary school in Brentwood, Tennessee, where she believed the children would be better served educationally.

{¶7} Ultimately, Warren recommended that it is in the children's best interest to remain in Marion and to designate Vance as the children's residential parent for school purposes, noting that the children seemed well connected to their school, neighborhood, and extended family—particularly to the children's paternal uncles and cousins and maternal grandmother, all of whom reside in the Marion area.

{¶8} On May 24, 2010, the trial court heard testimony from several witnesses including friends, neighbors, co-workers, and family members of each party. In addition, Vance offered the testimony of the principal of Heritage Elementary School, where the children attended school in Marion at the time of the hearing, as well as each child's current teacher at Heritage Elementary. During this hearing, the report submitted by the family-services coordinator was admitted into evidence as the trial court's sole exhibit.

{¶9} On August 9, 2010, the proceedings continued, and both parties offered their testimony concerning the modification of the shared-parenting plan. At the end of the testimony, several exhibits were admitted into evidence,

including a "504 accommodation plan" for Keegan prepared by Heritage Elementary and the medical records of both children.

{¶10} On August 19, 2010, the trial court issued its decision on the matter. The trial court determined that the requisite change in circumstances had occurred in order to consider modification of the parties' prior decree. The trial court then evaluated the statutory factors listed in R.C. 3109.04(F)(1) to determine whether a modification of the parties' parental rights and responsibilities is in the children's best interest. Ultimately, the trial court concluded that it is in the best interest of the children for Shannon to be named residential parent for school purposes and found that the harm likely to be caused by a change of environment is outweighed by the advantages of the change of environment to the children. Accordingly, the trial court granted Shannon's motion and modified the parties' shared-parenting plan.

{¶11} The trial court ordered Shannon to have the children for the majority of the school year, while Vance was given parenting time during the children's summer school break with an exception of two weeks, which were reserved for Shannon so that she could take the children on a family vacation. Vance was also granted parenting time every fall school break, Thanksgiving, and spring break in odd years. The trial court apportioned Christmas break so that both Vance and

Shannon would receive time with the children during part of the break and would alternate spending Christmas Day with the children every other year. The remaining holidays were allocated pursuant to Loc.R. 32. The parties were also ordered to share equally the cost of transportation for parenting time. Notably, Vance and Shannon each remained the residential parent and legal custodian of the children when exercising his or her individual parenting time as stated in the original decree.

{¶12} Shannon and the children subsequently moved to Tennessee. Vance filed a motion to stay the execution of the August 19, 2010 judgment entry pending this appeal, which was denied by the trial court.

{¶13} Vance now asserts the following assignments of error on appeal.

Assignment of Error No. I

In support of the modification of the prior parental rights and responsibilities for the minor children, the trial court erred as a matter of law and abused its discretion by determining there was a substantiated and sufficient "change in circumstances" pursuant of [sic] Ohio Revised Code 3109.04(E)(1)(a).

Assignment of Error No. II

In support of the modification of the prior parenting rights and responsibilities for the minor children and pursuant of [sic] Ohio Revised Code 3109.04(E)(1)(a) and 3109.04(F)(1), the trial court erred against the weight of the evidence and abused its discretion in determining "that a modification is necessary to serve the best interest of the child."

-6-

Assignment of Error No. III

> In support of the modification of the prior parental rights and responsibilities for the minor children and pursuant of [sic] Ohio Revised Code 3109.04(E)(1)(a)(iii), the trial court erred and abused its discretion in determining that "the harm likely to be caused by a change of environment is outweighed by the advantages that a change of environment would have on the minor child."

{¶14} Because Vance's assignments of error are interrelated, we elect to address them together.

{¶15} Initially, we observe that child-custody determinations are some of the most difficult and agonizing decisions a trial court must make. Therefore, a trial court must have wide latitude in its consideration of the evidence. *Davis v. Flickinger* (1997), 77 Ohio St.3d 415, 674 N.E.2d 1159. Generally, when reviewing a ruling pertaining to the allocation of parental rights, the trial court is to be afforded great deference. *Miller v. Miller* (1988), 37 Ohio St.3d 71, 523 N.E.2d 846. Thus, we will not reverse a child-custody decision that is supported by a substantial amount of competent, credible evidence absent an abuse of discretion. *Bechtol v. Bechtol* (1990), 49 Ohio St.3d 21, 550 N.E.2d 178, syllabus. The term "abuse of discretion" connotes more than an error of judgment; it implies that the court's attitude is unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore* (1983), 5 Ohio St.3d 217, 219, 450 N.E.2d 1140.

{¶16} R.C. 3109.04(E)(1)(a) authorizes a trial court to modify or terminate a prior decree allocating parental rights and responsibilities. The statute outlines the elements that the trial court must consider in its determination of whether a modification of the prior decree is warranted. Specifically, R.C. 3109.04(E)(1)(a) states the following regarding a modification of a prior custody decree:

> The court shall not modify a prior decree allocating parental rights and responsibilities for the care of children unless it finds, based on facts that have arisen since the prior decree or that were unknown to the court at the time of the prior decree, that a change has occurred in the circumstances of the child, the child's residential parent, or either of the parents subject to a shared parenting decree, and that the modification is necessary to serve the best interest of the child. In applying these standards, the court shall retain the residential parent designated by the prior decree or the prior shared parenting decree, unless a modification is in the best interest of the child and one of the following applies:
>
> (i)    The residential parent agrees to a change in the residential parent or both parents under a shared parenting decree agree to a change in the designation of residential parent.
>
> (ii)    The child, with the consent of the residential parent or of both parents under a shared parenting decree, has been integrated into the family of the person seeking to become the residential parent.
>
> (iii)    The harm likely to be caused by a change of environment is outweighed by the advantages of the change of environment to the child.

{¶17} When a court is asked to modify a custody decree, the initial determination to be made by the trial court is whether there has been a change in circumstances of the child or the residential parent since the prior court order. *Wyss v. Wyss* (1982), 3 Ohio App.3d 412, 414, 445 N.E.2d 1153. This finding should be made prior to weighing the child's best interest. The purpose of requiring a finding of a change in circumstances is to prevent a constant relitigation of issues that have already been determined by the trial court. *Clyborn v. Clyborn* (1994), 93 Ohio App.3d 192, 196, 638 N.E.2d 112. Therefore, the modification must be based upon some fact that has arisen since the prior order or was unknown at the time of the prior order. R.C. 3109.04(E)(1)(a).

{¶18} In reviewing whether the evidence presented in this case demonstrated that a change in circumstances has occurred, we are reminded that the change must be of substance, not slight or inconsequential. *Flickinger,* 77 Ohio St.3d 415, 674 N.E.2d 1159. In addition, R.C. 3109.04(E)(1)(a) does not require that the change be "substantial," nor does " the change * * * have to be quantitatively large, but rather, must have a material effect on the child." *McLaughlin v. McLaughlin-Breznenick*, 3d Dist. No. 8-06-06, 2007 -Ohio- 1087, ¶ 16, citing *Tolbert v. McDonald,* 3d Dist. No. 1-05-47, 2006-Ohio-2377, ¶ 31.

{¶19} In the instant case, the trial court found "that mother's relocation out of the State of Ohio is a change in circumstances that will necessitate a modification of the parental rights and responsibilities for the minor children." On appeal, Vance contends that Shannon's mere "desire" to relocate out of state, standing alone, is insufficient to constitute a change in circumstances and directs our review to a series of cases that he asserts reiterates this conclusion. After reviewing the jurisprudence on this issue, we observe that Vance oversimplifies the relevant case law.

{¶20} It is settled that the relocation of the residential parent, in and of itself, does not constitute a change in circumstances as to support a motion for change of custody. See, e.g., *Rohrbaugh v. Rohrbaugh* (2000), 136 Ohio App.3d 599, 604, 737 N.E.2d 551; *Vincenzo v. Vincenzo* (1982), 2 Ohio App.3d 307, 308-309, 441 N.E.2d 1139. However, it is equally settled that a court may consider any attendant circumstances surrounding a residential parent's relocation that affect the child's welfare in determining whether a change in circumstances has occurred. See *Zinnecker v. Zinnecker* (1999), 133 Ohio App.3d 378, 383-385, 728 N.E.2d 38, citing *Green v. Green* (Mar. 31, 1998), 11th Dist. No. 96-L-145. In particular, "a court may consider the fact that a relocation of the child would remove him or her from a supportive network of family and friends as a factor in

finding that a change of circumstances has occurred after the custodial parent expresses a desire to move to another state." *In re Longwell* (Aug. 30, 1995), 9th Dist. No. 94CA006006. Indeed, "a move may constitute a change of circumstances when coupled with evidence of other adverse effects, such as a disruption in ongoing relationships with extended family." *In re D.M.*, 8th Dist. No. 87723, 2006-Ohio-6191, at ¶ 36. In addition, it may be necessary for a trial court to distinguish between contemplated relocations and those that have already been accomplished. See *DeVall v. Schooley*, 5th Dist. No. CT2006-0062, 2007-Ohio-2582, ¶ 16.

{¶21} The testimony before the trial court demonstrates that due to an internal restructuring of Shannon's employer, the position she held while living in Marion was "being assumed by other groups" because the company intended to eliminate the position in June 2010. Shannon accepted a promotion within the same company, which required her to relocate to Tennessee — seven hours by car from Marion. The testimony also reveals that Shannon intended to move in with her fiancé, who also worked for Shannon's employer as a vice president and resided with his children in the Nashville area. However, Shannon maintained that her relocation to Tennessee was based upon her promotion and asserted that the move would have occurred regardless of her personal relationship.

{¶22} Shannon testified that during the past few years, the children had visited Tennessee five or six times and appeared comfortable with the location. However, the evidence demonstrates that none of the children's relatives or friends live in Tennessee and that the boys had several relatives and friends in the Marion area, where they had lived since their births. Moreover, due to the nature of the parties' prior custody decree and the fact that both parents live in close proximity, the children had spent a considerable amount of time with both Shannon and Vance since their divorce in 2006. Shannon's impending relocation required that the children would not see one of their parents for an extended period of time.

{¶23} Based on these attendant circumstances, it is apparent that the shared-parenting plan in place was no longer feasible given Shannon's plans to relocate to Tennessee. Moreover, regardless of who would ultimately be named the residential parent for school purposes, the children's lives were going to be dramatically altered because they would no longer be able spend an equal amount of time with both parents. Accordingly, we find that the trial court did not err in finding that Shannon's impending relocation is a substantial change having a material effect on the children and constitutes a change in circumstances contemplated by R.C. 3109.04(E)(1)(a). Therefore, to this extent, Vance's first assignment of error is overruled.

{¶24} Having concluded that the trial court properly found that the requisite change in circumstances had occurred, we next turn to the trial court's determination that a modification of the prior custody decree is in the children's best interest. R.C. 3109.04(F)(1) provides a list of nonexclusive factors for the trial court to consider in determining the best interest of the children. These factors include:

> (a) The wishes of the child's parents regarding the child's care;
>
> (b) If the court has interviewed the child in chambers pursuant to division (B) of this section * * *, the wishes and concerns of the child, as expressed to the court;
>
> (c) The child's interaction and interrelationship with the child's parents, siblings, and any other person who may significantly affect the child's best interest;
>
> (d) The child's adjustment to the child's home, school, and community;
>
> (e) The mental and physical health of all persons involved in the situation;
>
> (f) The parent more likely to honor and facilitate court-approved parenting time rights or visitation and companionship rights;

(g)     Whether either parent has failed to make all child support payments, including all arrearages, that are required of that parent pursuant to a child support order under which that parent is an obligor;

(h)     Whether either parent or any member of the household of either parent previously has been convicted of or pleaded guilty to any criminal offense involving any act that resulted in a child being an abused child or a neglected child; * * *

(i)     Whether the residential parent or one of the parents subject to a shared parenting decree has continuously and willfully denied the other parent's right to parenting time in accordance with an order of the court;

(j)     Whether either parent has established a residence, or is planning to establish a residence, outside this state.

{¶25} In addressing each of the statutory factors relevant to the instant case, the evidence establishes that both Shannon and Vance wished to be named their children's residential parent for school purposes. Moreover, each parent expressed significant concerns with the children's residing with the other for the school year.

{¶26} Shannon's testimony reveals that her concerns focused primarily on education and medical issues, particularly with regard to the youngest, Keegan.

Shannon expressed that she was not satisfied with the way Heritage Elementary in Marion approached Keegan's education challenges since his diagnosis with Tourette's syndrome. Shannon disapproved of the interventions that the school had put in place to assist Keegan and the 504 accommodation plan developed specifically for Keegan and what she viewed as the school's reluctance to put an individualized education program ("IEP") in place for Keegan. Shannon touted that the school in Brentwood Tennessee, Sunset Elementary—where her fiancé's children attended—had many "more resources" and "more money" than Heritage and thus could better accommodate Keegan by immediately developing an education plan suited to him. Shannon feared that Keegan would simply fall through the cracks if he remained in the Marion area schools. However, there was no evidence presented, aside from Shannon's mere conjectures, to substantiate that the school in Tennessee would better serve her children than the school in Marion.

{¶27} Another major concern for Shannon was obtaining medical treatment for Keegan's Tourette's syndrome. Shannon testified that she and Vance first noticed Keegan's ticks in kindergarten, and they got progressively worse. Shannon explained that as a registered nurse, she is more educated to handle Keegan's neurological issues and took the lead in this regard. Shannon expressed her dissatisfaction with the doctors in Marion and that it took months before she

could get Keegan an appointment with a neurologist at Nationwide Children's Hospital in Columbus. Throughout her testimony, Shannon asserted that the community resources available to her in Tennessee were far superior to Marion. However, the majority of Shannon's testimony on this point was based on her own speculation and not on any concrete or independent evidence.

{¶28} Finally, Shannon expressed her doubts that Vance would adequately step up and take the lead in attending to the children's school and medical matters if he were named residential parent for school purposes. However, there was no evidence presented demonstrating that Vance was incapable of stepping into this role.

{¶29} Vance maintained that he has always been involved with the children's education and is more than capable of being the primary parent to handle his children's education matters. Vance admitted that Shannon took the lead in making doctor's appointments for the boys, but this was due to the fact that she worked from home and had a more flexible schedule during the day. Vance indicated that he would have no problem making doctor appointments for the children if he were named residential parent for school purposes.

{¶30} Vance testified that he was satisfied with the way Heritage Elementary approached Keegan's Tourette's syndrome. He stated that the 504

accommodation plan was not requested for Keegan until January 2010, that it took only a few months to develop, and that it would be in place for the next academic year to be monitored for its effectiveness and modified accordingly.

{¶31} Vance's primary concern with Shannon's intentions to move the children out of state was that they would be uprooted from the only family and community they have ever known. Vance testified to the strong relationships that the children had built with his two brothers and their families, who all reside in the Marion area, in addition to childhood friends that they have known for years. Vance expressed his concern with the children's moving to Tennessee, where none of their friends or relatives live. The only people the children were familiar with in Tennessee were Shannon's fiancé and his children, who are older than Hayden and Keegan. Vance worried that if the children moved to Tennessee, their father-son relationships would greatly suffer.

{¶32} With regard to the statutory factor R.C. 3109.04(F)(1)(b), we note that neither party requested that the trial court conduct an in camera interview with the children, nor did the court apparently find it necessary to do so. However, Ken Warren, the family services coordinator, interviewed both children and included his assessment of the children in his report submitted to the trial court.

{¶33} Warren's report indicates that Hayden was in the third grade at Heritage Elementary School at the time Warren met with him. Warren noted that Hayden expressed that he was "doing pretty good at school,; that he had "a lot of friends at school and a few at each parent's home,; and that "both parents help him with his homework about equally." Warren also made the following assessment, "Hayden seems to be well bonded to both parents and to his brother. He enjoys having equal time with both parents. He seems to be well adjusted to his school and has some trepidation about leaving his familiar environment."

{¶34} The younger child, Keegan, told Warren that he was in the first grade at Heritage Elementary and that he was doing well in school. Keegan indicated that Shannon helps him with his homework at her house, and Vance helps him with his homework at his house if he says he needs help. Keegan also told Warren that he played basketball and flag football and that his father went to his games and that his mother was there sometimes. Warren noted that "Keegan seems to be well bonded to both parents but perhaps more so to his mother. Keegan said that they were going to get a computer and could talk to their father on the computer."

{¶35} The evidence before the trial court regarding the next statutory factor pertaining to the children's interaction and interrelationship with their parents, siblings, and any other person who may significantly affect their best interest

indicates that the vast majority of these relationships were established and cultivated in the Marion area.

{¶36} Shannon testified that she is very involved with the children, taking them to classes at the YMCA and attending swimming classes. Shannon participated in their school as a room mother and accompanied the children on school field trips as a chaperone. Testimony before the court also demonstrates that Keegan is extremely close to his mother. Shannon also presented testimony that Keegan preferred to be in her care and would sometimes hide when Vance came to take the children for his visitation. However, there was also testimony before the trial court from Shannon's mother that Keegan also hid from Shannon when she came to pick up the children. Shannon's mother explained that the parties' back-and-forth custody arrangement in the shared-parenting plan was very difficult on Keegan.

{¶37} Vance testified that the boys were active in sports. Vance stated that he and his brother, Vince, helped coach Hayden's football team. Hayden played on the same team as Vince's son, Hayden's cousin, who was the same age as Hayden. Each year, Vance helped Hayden build a pinewood-derby car for the Scouts' pinewood derby race. Vance also coached Keegan's soccer team for two years and helped as a substitute coach for his T-ball team. Vance testified that he

and the boys went fishing with his brothers and their kids, who are all around the same ages. Vance recalled that they had already been on several fishing trips that summer when he provided his testimony in August 2010.

{¶38} Vince Brammer, Vance's brother, testified that he lived in the Marion area with his family. Vince stated that he and his wife built a house down the street from Shannon and Vance so that their families could be close to one another. Vince testified that even though Shannon and Vance moved out of the neighborhood after they divorced, Hayden and Keegan remained very close to his children. Vince explained that in addition to playing sports and fishing together, the cousins often have sleepovers at each other's houses along with Vance and Vince's other brother, Victor, who also lives in Marion and has children around the same age. Vince expressed his concern that if the children moved to Tennessee, it would break the bonds between the cousins. Vince described his relationship with his family and both his brothers' families as a "support system" that will fill in to help with the children when needed. Vince testified that in the past, they have helped Vance get the children to and from school and had assisted them with their homework when Vance was unable to do so.

{¶39} Shannon's mother, Shirley West, also lives in the Marion area and for several years played a significant caretaker role in the children's lives, seeing

them at least once a week. Shirley's testimony reveals that she was the only grandparent in the children's lives. Shirley explained that she filled in as a babysitter for both Shannon and Vance when needed and that she developed a close relationship with her grandsons. However, she recently started a new company and was no longer able to spend the same amount of time with the children because she traveled often with her job. As a result, she now saw the children only once or twice a month.

{¶40} Further testimony before the trial court indicates that Shannon has a sister in Cleveland whom she and children see every three months, but that they have not seen Shannon's other sister and brother, who resided in Michigan, for a couple of years.

{¶41} The only person residing in Tennessee who testified at the hearing was Shannon's fiancé, Mark Rappe. Mark testified that Hayden and Keegan had visited his home in Brentwood, Tennessee, where Shannon intended to reside once she relocated, three to five times within the past two years. Most of these visits occurred over the span of a weekend. Mark explained that he has two children, a 14-year-old daughter and a 12-year-old son. Mark recalled that Hayden and Keegan have been on vacations with his family to Florida. Mark stated that his

children have bonded well with Hayden and Keegan and are excited for the boys to join their family.

{¶42} The next factor to be considered by the court addresses the children's adjustment to their home, school, and community. As previously stated, much of the testimony before the court demonstrates that the children had forged strong bonds with family and friends in the Marion community where they have lived their entire lives. However, a major point of contention between the parties focused on the adequacy of River Valley schools in educating their children.

{¶43} Vance presented the testimony of Craig Lautenslager, the principal of Heritage Elementary, as well as the testimony of Jennifer Miley and Sally Dean, who were Hayden's and Keegan's teachers at Heritage Elementary.

{¶44} Principal Lautenslager testified that River Valley schools are ranked as excellent in the state-wide rankings. He further testified that third-grader Hayden is well adjusted to the River Valley school system. Principal Lautenslager reviewed Hayden's current report card and testified that overall, Hayden is having "a very successful time at Heritage" and that he was on par with other students in meeting the grade-level standard.

{¶45} Principal Lautenslager then reviewed Keegan's records and testified that first-grader Keegan was also well adjusted to the school. Principal

Lautenslager testified that the school brought Keegan into the intervention assistance team ("IAT"), which is "a general education initiative * * * that happens when either the parent or the teacher thinks that a child might need some additional work or strengths or some areas to receive some additional intervention." Principal Lautenslager testified that in Keegan's case, the IAT was initiated due to his Tourette's syndrome and his teacher's concern that his reading level was below the target level for his grade. Principal Lautenslager explained that the IAT had met twice regarding Keegan. According to Lautenslager, the first meeting took place on April 14, 2010, and included Vance, the special-education-intervention teacher, Keegan's classroom teacher, and himself. The second meeting, on May 19, 2010, had occurred one week before Lautenslager gave his testimony to the court and included Vance and Shannon, the special-education-intervention teacher, the classroom teacher, the school psychologist, and himself.

{¶46} At this second meeting, the team discussed whether the interventions and accommodations put in place since the first meeting were successful. Principal Lautenslager reviewed his notes from the meeting and noted that Keegan had made process with his reading level. The team also discussed adjusting certain interventions and accommodations that appeared not to be working well for Keegan. After assessing this data and determining that some of the

-23-

accommodations were successful, the team concluded that a 504 accommodation plan, rather than an individualized education plan ("IEP"),[2] would be more appropriate for Keegan due to its flexibility and the fact that Keegan is very bright, does not exhibit any signs of a learning disability, and does not like to be isolated.

{¶47} Principal Lautenslager explained that a 504 accommodation plan "is a general [education] initiative where we put accommodations that will follow Keegan wherever he goes." Principal Lautenslager further described the accommodations appropriate for Keegan: "[T]he accommodations we're going to give him are that he needs prompt redirections, he needs sentence starters, he needs clarifications, he needs a quiet environment, extended time, silent reading, and reading alone without an audience." Principal Lautenslager explained that these accommodations will also be in place when Keegan takes a statewide test or a diagnostic-level test and will follow him as he advances to the next grade level.

{¶48} Keegan's teacher, Sally Dean, also provided testimony regarding Keegan's performance in school. Dean remarked that Keegan is a very happy child who is right on target with his math, social studies, and science skills. Dean acknowledged that there is some concern that Keegan's reading skills are slightly

---

[2] According to Principal Lautenslager, an IEP would require that Keegan be given special instruction.

behind the target level. However, Dean confirmed that a 504 plan is being developed to assist Keegan in that regard. In addition, Dean commented on the speed in which Heritage acted to address Keegan's special needs: "Moving to a 504 [plan] for Keegan in two months is exceptional. I've never seen an IAT process go as quickly as I have with Keegan. And I do at least four IAT's a year on children."

{¶49} Dean testified that beginning in November 2009, she had several meetings with both Shannon and Vance concerning Keegan's reading level and his involuntary muscle movements, which were later diagnosed as ticks caused by Tourette's syndrome. Dean explained that some special accommodations had been developed to assist Keegan, and he was making progress as a result. Dean testified that she kept a log counting the number of ticks Keegan had during class so the neurologist could understand when the ticks occurred. She further testified that Keegan's ticks had significantly improved and that she was pleased with the progress Keegan has made with his reading skills since the beginning of the school year.

{¶50} Hayden's teacher, Jennifer Miley, also provided testimony. Miley testified that Hayden does best in science and social studies and with hands-on activities and that she was very proud of his accomplishments in reading. Miley

testified that both parents were involved with Hayden's schooling and that Vance helped chaperone one of the class field trips during the year.

**{¶51}** With regard to the statutory factor concerning the mental and physical health of all persons involved in the situation, the evidence reveals that no one involved suffered from any physical-health restraints and that the only health concern is monitoring Keegan's Tourette's syndrome as it relates to school and social matters.

**{¶52}** The evidence before the trial court also indicates that Vance and Shannon operated effectively under the shared-parenting plan for four years. Both were cordial with each other in handling custody matters and accommodated each other when scheduling issues arose. There was also no child support ordered as part of the original decree and no indication that one parent willfully or continuously denied the other parent's right to parenting time.

**{¶53}** With regard to the last statutory factor considering a parent's plans to move out of state, the evidence before the court clearly demonstrates that Shannon intended to move to Tennessee, where she planned to establish her permanent residence.

**{¶54}** In its judgment entry modifying the parties' shared-parenting plan, the trial court stated that it considered the best-interest factors enumerated above

in determining whether the evidence warranted a modification of the prior custody decree. The trial court determined that it is in the children's best interest to modify the prior decree. However, despite the majority of the evidence discussed above supporting keeping the children in Marion and naming Vance the residential parent for school purposes, the trial court concluded that it is in the children's best interest to designate Shannon as the residential parent for school purposes.

{¶55} In reviewing the trial court's rationale for its conclusion, we note that the trial court appears to focus on the testimony presented that the children would receive a better education in Tennessee than if they remained in Marion, and that Shannon is the parent better equipped to address Keegan's medical needs. Specifically, the trial court concluded:

> The area in which [Shannon] will be residing in Nolensville, Tennessee is reported to have high ratings for their scholastic and academic achievements. Upon investigation of the schools Mother reports and believes Keegan will be better served, due to his learning difficulties, through the school in Nolensville, Tennessee. She believes that the Nolensville, Tennessee schools will offer both children a better education than the schools in Marion, Ohio. Mother is very educationally driven for the children.
>
> * * *
>
> Mother has been, as agreed by all parties, the primary parent to address the medical issues for the children. Keegan's situation, although not critical, is

going to require close medical attention. Mother is a registered nurse and has educated herself on Tourette's syndrome and its treatment. Both parties are committed to insuring that the child has the appropriate medical care; however, mother is in the most advantageous position to advocate for the child's proper medical treatment as well as educational supports.

{¶56} Initially, we observe that in contrast to the considerable testimony regarding the specific programs offered by Heritage Elementary, there is virtually no actual evidence to support the trial court's conclusion that the children will actually be better served by the Tennessee school. The limited testimony concerning the school in Tennessee was presented by Shannon, her fiancé, and a good friend of the couple who used to substitute teach at the school and admitted that it was difficult to compare schools state-by-state because of the different ranking systems used. Most of the testimony presented by Shannon was simply based on *her belief* that the school would be better for Keegan, without any independent evidence corroborating her opinions on the matter. Furthermore, despite Shannon's dissatisfaction with Heritage Elementary, the evidence supports that the school has used every resource available to develop accommodations for Keegan and that he was making progress as a result of these efforts.

{¶57} In addition, even though the evidence indicates that Shannon took the lead in handling the children's education and medical issues, there is no indication

in the record that Vance is incapable of assuming this role. To the contrary, Vance's testimony demonstrates that his involvement with the children's education and medical matters has been substantial and that he would be willing to continue to ensure that the children's needs are met if he were named residential parent for school purposes.

{¶58} We also observe that the trial court's conclusion appears to focus almost entirely on the youngest child, Keegan, who suffers from Tourette's syndrome, with which he was diagnosed only months prior to the trial court's decision. The trial court seems to completely overlook uncontroverted testimony indicating that the older child, Hayden, is extremely well adjusted to the school and community in Marion and is reluctant to move out of state.

{¶59} Notwithstanding these observations, we note that none of the best-interest factors contained in R.C. 3109.04(F)(1) address the school or community the child *will experience if the custody decree is modified*. Rather, the factors almost exclusively focus on the child's current environment at the time the court considered a modification of the prior decree. In this respect, the evidence before the trial court overwhelmingly reveals that the children have developed strong ties to the Marion community, where the majority of their extended family lives.

{¶60} In reviewing the testimony presented to the trial court within the framework of the statutory factors, we conclude that the evidence heavily favors a decision to keep the children in Marion, where the children are well adjusted and established in a supportive family and community network. Nevertheless, despite this substantial amount of evidence and the recommendation of the family-services coordinator supporting a decision to designate Vance the children's residential parent for school purposes, the trial court concluded otherwise. However, we cannot find evidence in the record that supports uprooting the children from an environment where they are surrounded by family and friends simply to place them in a new state where the only people known to them are their mother, her fiancé and his children, with whom they have had only intermittent contact during the past two years. Moreover, we do not find that Shannon's belief regarding a potential advantage that the youngest child may receive in the Tennessee school is strong enough to outweigh the evidence from teachers and a school principal substantiating actual educational advantages that both children have received while residing in Marion. Therefore, we do not find that the evidence supports the trial court's decision that it is in the best interest of the children to designate Shannon as residential parent for schools purposes.

{¶61} We are mindful that the trial court is typically afforded wide latitude in determining custody matters; however, when the trial court's determination is not supported by a substantial amount of competent, credible evidence, we have no choice but to conclude that the decision constitutes an abuse of discretion. Furthermore, we are also reminded that " '[t]he clear intent of [R.C. 3109.04(E)(1)(a) ] is to spare children from a constant tug of war between their parents who would file a motion for change of custody each time the parent out of custody thought he or she could provide the child a "better" environment. The statute is an attempt to provide some stability to the custodial status of the children, even though the parent out of custody may be able to prove that he or she can provide a better environment.' " *Flickinger,* 77 Ohio St.3d 415, 418, 674 N.E.2d 1159, quoting *Wyss v. Wyss* (1982), 3 Ohio App.3d 412, 416, 3 OBR 479, 445 N.E.2d 1153.

{¶62} Accordingly, we must conclude that the trial court abused its discretion in determining on this evidence that it is in the children's best interest to designate Shannon the residential parent for school purposes. As a result, it is our determination that the trial court's judgment was not supported by a substantial amount of competent, credible evidence and is in fact against the weight of the evidence.

{¶63} Based on the reasons above, Vance's second and third assignments of error are sustained, the judgment is reversed, and the cause is remanded for further proceedings consistent with this opinion.

Judgment reversed
and cause remanded.

ROGERS, P.J., and WILLAMOWSKI, J., concur.

/jlr