[Cite as *Torch v. Criss*, 2015-Ohio-5328.]

COURT OF APPEALS
TUSCARAWAS COUNTY, OHIO
FIFTH APPELLATE DISTRICT

| | | |
|---|---|---|
| KAREN L. TORCH | : | JUDGES: |
| | : | Hon. William B. Hoffman, P.J. |
| Plaintiff - Appellant | : | Hon. Patricia A. Delaney, J. |
| | : | Hon. Craig R. Baldwin, J. |
| -vs- | : | |
| | : | |
| MARK CRISS | : | Case No. 2015 AP 04 0020 |
| | : | |
| Defendant - Appellee | : | O P I N I O N |


CHARACTER OF PROCEEDING:          Appeal from the Tuscarawas County
                                  Court of Common Pleas, Juvenile
                                  Division,  Case No. 2006 PA 00410


JUDGMENT:                         Affirmed


DATE OF JUDGMENT:                 December 17, 2015


APPEARANCES:

For Plaintiff-Appellant                    For Defendant-Appellee

JEREMY J. FOLTZ                            DEBORAH E. GREENHAM
122 Central Plaza North                    P.O. Box 711
Canton, Ohio 44702                         New Philadelphia, Ohio 44663

*Baldwin, J.*

{¶1}    Plaintiff-appellant Karen Torch appeals from the March 31, 2015 Judgment Entry of the Tuscarawas County Court of Common Pleas, Juvenile Division naming appellee Mark Criss the primary residential parent of Nikson.

STATEMENT OF THE FACTS AND CASE

{¶2}    On December 21, 2006, appellant Karen Torch (then known as Karen Shedron), the mother of a minor child named Nikson (DOB 7/25/06), filed a complaint to establish a parent and child relationship in the Tuscarawas County Court of Common Pleas, Juvenile Division. Appellee Mark Criss, on May 14, 2007, filed a complaint seeking custody of Nikson. On June 19, 2007, appellee admitted in open court that he was the biological father of Nikson. Appellee was subsequently ordered to pay child support for the child.

{¶3}    Appellee, on January 31, 2008, filed a motion to adopt a shared parenting plan and, on February 20, 2008, filed a supplemental motion seeking custody.  Appellant, on March 5, 2008, filed a Motion for Legal Custody. The parties subsequently agreed to a shared parenting plan that was filed on May 13, 2008.

{¶4}    Shortly thereafter, appellee, on June 6, 2008, filed a Supplemental Motion for Custody. Pursuant to a Magistrate's Decision that was filed on October 27, 2008 and adopted by the trial court on January 14, 2009, the motion for change of custody was denied.

{¶5}    Subsequently, on June 15, 2012, appellee filed a Motion to Terminate Shared Parenting and to Reallocate Parental Rights and Responsibilities. The parties, on

December 10, 2012, reached an agreement and an agreed entry was filed on January 2, 2013.

{¶6}    On May 7, 2014, appellee filed A Motion to Modify Parental Rights and Responsibilities. A hearing on such motion was held before a Magistrate on various days in 2014 and 2015.

{¶7}    At the hearing, Candi James, a first grade teacher at Tusky Valley, testified that Nikson was in her first grade class the past year and that she communicated with both parents via email and phone calls. She testified that they both attended conferences. According to James, Nikson had misbehaved during a fire drill and had some behavioral issues. She stated that she believed that Nikson acted out because he was frustrated over his academic limitations.  James also testified that when Nikson entered first grade, he was at a reading level 3 and had advanced to a level 4 but "should have been going up a little bit faster than that." Transcript at 8. She explained that first graders usually began at level 3 and should progress to level 14-16 throughout the year. Because she felt that it helped if parents read at home with their child, James sent things home for Nikson, including math flash cards. According to James, Nikson was one of the lowest in her class in terms of his ability to read and came to her not knowing all of his sight words. She stated that he did not retain what he learned and struggled with reading and writing.

{¶8}    James testified that Nikson, who had been held back in kindergarten and therefore could not be held back in first grade, had trouble concentrating and needed extra help. Testing ruled out any learning disabilities. She testified that he was not good at checking his work and had to redo things. She also testified that he went behind her desk when he knew he was not supposed to and that he made bad choices.  Nikson also

kneed a boy and made him cry and talked and disrupted class, causing James to voice concerns that Nikson could turn into a bully. She later testified that Nikson did not have a very good attitude at times and had an IQ of 87. She indicated that she was concerned that when he left first grade, his reading level was still 8 and that Nikson may need an IEP [Individual Education Plan] later in life. James testified that his attitude might have to change for him to improve and that if his parents got along better, Nikson would not have so much on his mind.

{¶9}   At the hearing, Karen Criss, appellee's mother, testified that she was concerned with Nikson's education because he was getting further and further behind in school.  She stated that she lived with appellee who had moved in with her in 2014 when she had surgery for bladder cancer. She testified that there was only one bedroom in the apartment and that appellee and Nikson shared it while she slept on a bed in the living room. Criss testified that she felt great, was cancer-free and was driving again. According to Criss, appellee worked with Nikson and had hired a tutor for him the last two years. She also testified that she took care of Nikson while appellee was working

{¶10}  The Guardian ad Litem (GAL) testified that she had been working on this case since 2010 and had concluded in a recent report that she had "grave concerns" about Nikson's academic process because he was not reading at grade level and acted up out of frustration. Transcript at 64. She stated that he needed immediate intervention and individualized attention on a one-on-one basis. According to the GAL, appellee had the ability and resources to get Nikson up to speed while appellant did not because she had many more children in her home and did not have the time or money to provide the required resources. She recommended a change in custody as the "only option at this

point." Transcript at 64.  The GAL further voiced concerns over how appellant, who had ongoing financial difficulties,  could afford her $1,693.00 a month in rent for a large house, which she believed was not realistic in terms of appellant's budget at the time and did not include utilities.  At the time, appellant was receiving $1,000.00 a month in unemployment plus $1,800.00 a month in child support.  In addition, in her budget, appellant indicated that her two older children would each be paying $400.00 a month in rent.

{¶11}  When asked, the GAL testified that she had not seen the school in Parma that Nikson would go to if he moved to appellee's home.  She stated that she believed that intensive work with him nearly every evening would be the only chance for Nikson to change. The GAL further testified that appellee's home would be fine for Nikson and that she had no concerns about Karen Criss being able to care for him. The GAL also testified that she was aware that after appellee filed his motion, Nikson started counseling in May of 2014. There had been no ongoing counseling prior to such time since counseling was terminated in November of 2013. The counselor recommended a custody evaluation.

{¶12}  On cross-examination, the GAL indicated that she recommended a change of custody so that there was a chance that Nikson would improve. She agreed that there could be no improvement even with a change of custody and that Nikson was bonded to both of his parents. The GAL stated that she was concerned that appellee had not been involved in mental health counseling for Nikson. According to her, Nikson was "kind of non-committal" about changing schools. Transcript at 86.

{¶13} At the hearing, appellee testified that he was concerned about Nikson's education because he struggled and did not retain what he learned. He testified that he was in contact with Nikson's teacher and talked to her and that the teacher e-mailed him

on a daily basis. He also went to conferences. The following is an excerpt from appellee's testimony:

{¶14}  Q:  What, what about the emails concerned you?

{¶15}  A:  His education and him getting in trouble.

{¶16}  Q:  Okay, can you give examples of things you read that you made, caused your concern?

{¶17}  A:  Ah, one of the emails he [Nikson] has slid down the rail, and was running in the hall, the other one, one of them was ah, he, he was messing, what I think it was a little girl that was next to him, the teacher had to move him.  One of the emails was he elbowed a kid in the side at lunch time, and made him cry and ah, he stomped on a kid's foot and, ah, he'd run behind the teacher's desk, ah, when, when she went outside for a minute, and toward the end of the year, that he had the email, she had emailed me where he had slammed the locker on that girl's hand and hurt her hand.  And ah, that all concerns me.  It's not leading in the right direction.

{¶18}  Q:  Um, do you believe, Mark, that this is a crucial point, for Nikson right now, in terms of his education?

{¶19}  A:  Absolutely.

{¶20}  Q:  Why?

{¶21}  A:  Um, he, he's just going to fall further behind, and I'm not a psychologist or nothing, but I think the older you get in stuff, the harder it is, to, you know, start learning the things there and then not, because you're kind of going on one thing and moving on and you haven't learned what you need to get there.  So, I just think he's going to keep falling behind and behind, and it's just going to get harder and harder.

{¶22} Transcript at 95-96.

{¶23} Appellee testified that he was living with his mother to help her out after her surgery and that he had no concerns about her ability to help Nikson if appellee was at work. He testified that he worked on Sundays starting at midnight and the rest of the week went in at 1:00 a.m. He gets off work most days at 11:30 a.m. and is home before noon because he lives fifteen minutes from work. Appellee had been working at the same job for twenty years. Appellee testified that he had hired a tutor for Nikson the past two summers and that the tutor had worked with him to help his son with homework. Appellee testified that he made a report to Job and Family Services after Nate, appellant's son, smacked Nikson in the face during February, March or April of 2014. He did not see any marks on Nikson. According to appellee, appellant told him that Nate did not hit Nikson that hard. Appellee testified that Nate, when Nikson was nearby, told appellee to "F-You" and gave him the finger.

{¶24} On cross-examination, appellee testified that he would look into renting the apartment upstairs from his mother if he was granted custody. He testified that his mother would get Nikson ready for school and that other than his mother, he had no other relatives to serve as back-up support for Nikson. Appellee testified that, if necessary, he could change his work shifts and had third parties who he could rely on for help. Appellee testified that his son's fourth interim report concerned him because Nikson had showed no progress throughout the whole school year and was even having trouble in math, when he once had showed some improvement in that area.

{¶25} Appellant testified on cross-examination that her rent was $1,693.00 per month. She testified that had been selling health products for two weeks as a second job

and that she had two loyal customers.    Appellant claimed that she was guaranteed $500.00 a month if she met certain sales quotas. Appellant testified that she had seven children living with her and that if her two sons failed to pay their share of the rent, she still would be able to make her budget because of her sales.  Appellant stated that she was employed at Platinum Cleaning where she was earning $12.00 an hour for a forty hour work week. She admitted that she was upset when the GAL asked her how she could afford her house.  Appellant had been sued in the past for debt and was paying $275.00 a month for a used Cadillac Escalade.

{¶26}  Appellant testified that Nikson was improving in school because he went from a level 6 to a level 8, although he was supposed to be at a level 12.  She did not get any tutoring for Nikson between first and second grades. Appellant admitted that Nikson had not been in counseling from November of 2013 until May of 2014, when appellee filed for custody.

{¶27}  On direct examination, appellant testified that she has a $575.00 budget surplus each month and also had additional income from her sales job. She testified that she worked with Nikson on a nightly basis when she had him and that her job enabled her to get her son off to school. Appellant stated that she had extended family members to pick him up. According to her, Nikson was never called to the office by the principal.

{¶28}  Mary Beth Markley, Principal of Tusky Valley Elementary School, testified that Nikson was never suspended or expelled and that she had minimal contact with him. She had no knowledge of what happened in the classroom with respect to his behavior. Nikson had never been sent to her office.

{¶29} Mary Alice Biclawski testified that she was Nikson's tutor and had been working with him since September 8, 2014.  She saw him twice a week and sometimes on Saturdays. She testified that the one-on-one was beneficial to him. Biclawski had never spoken with appellee and had been retained by appellant. She testified that he was making progress, was motivated and has gone up two points to a level 8 as of November 2014.

{¶30} The GAL, on December 30, 2014, filed an update to her report. In her update, she stated that appellant's landlord reported that appellant was being evicted for non-payment of rent, but that the landlord would not file the eviction if appellant vacated the premises by January 15, 2015. The GAL indicated that appellant told her that she was moving back to her old home in Bolivar.  In response, appellee, on January 2, 2015, filed an ex parte emergency motion seeking temporary custody of Nikson. The Magistrate, in a Decision filed on January 9, 2015, recommended that appellee be designated primary residential parent and that his child support obligation be terminated and that appellant be granted companionship.

{¶31} Appellant filed objections to the Magistrate's Decision and a hearing on the objections was held on March 30, 2015. Pursuant to a Judgment Entry filed on March 31, 2015, the trial court overruled the objections and approved and adopted the Magistrate's Decision.

{¶32} Appellant now raises the following assignments of error on appeal:

{¶33} I. THE TRIAL COURT ABUSED ITS DISCRETION IN DETERMINING THAT A CHANGE OF CIRCUMSTANCES OCCURRED AND BY TERMINATING THE PREVIOUSLY AGREED CUSTODY ENTRY.

{¶34} II. THE TRIAL COURT ABUSED ITS DISCRETION WHEN IT FOUND THAT IT WAS IN THE BEST INTEREST OF THE CHILD TO DESIGNATE APPELLEE AS PRIMARY RESIDENTIAL PARENT.

I, II

{¶35} Appellant, in her two assignments of error, argues that the trial court abused its discretion in determining that a change of circumstances had occurred and that it was in Nikson's best interest that appellee be designated the primary residential parent.

{¶36} A trial court enjoys broad discretion in custody proceedings. *Cossin v. Holley,* 5th Dist. Morrow No. 2006 CA 0014, 2007–Ohio–5258, ¶ 28 citing *Davis v. Flickinger,* 77 Ohio St.3d 415,1997-Ohio-260, 674 N.E.2d 1159, paragraph one of the syllabus. In order to find an abuse of discretion, we must determine the trial court's decision was unreasonable, arbitrary or unconscionable and not merely an error of law or judgment. *Blakemore v. Blakemore,* 5 Ohio St.3d 217, 450 N.E.2d 1140 (1983).

{¶37} R.C. 3109.04(E)(1)(a) governs the modification of a prior decree allocating parental rights and provides, in relevant part:

> The court shall not modify a prior decree allocating parental rights and responsibilities for the care of children unless it finds, based on facts that have arisen since the prior decree or that were unknown to the court at the time of the prior decree, that a change has occurred in the circumstances of the child, the child's residential parent, or either of the parents subject to a shared parenting decree, and that the modification is necessary to serve the best interest of the

child. In applying these standards, the court shall retain the

residential parent designated by the prior decree * * * unless

the modification is in the best interest of the child * * *and one

of the following applies: * * * (iii) The harm likely to be caused

by a change of environment is outweighed by the advantages

of the change of environment to the child.

{¶38} Thus, before a court may modify a prior allocation of parental rights and responsibilities, it must consider: (1) whether a change in circumstances occurred, (2) whether modification is in the child's best interest, and (3) whether the benefits that result from the change outweigh any harm. *Clark v. Smith*, 130 Ohio App.3d 648, 653, 720 N.E.2d 973, 976 (3rd Dist. 1998). The record must support each of these findings or the modification of child custody is contrary to law. *Davis v. Flickinger,* supra at 417.

{¶39} "Although R.C. 3109.04 does not provide a definition of the phrase 'change in circumstances,' Ohio courts have held that the phrase is intended to denote 'an event, occurrence, or situation which has a material and adverse effect upon a child.' "*Lewis v. Lewis,* 12th Dist. Butler No. CA2001–09–209, 2002 WL 517991 (April 8, 2002), citing *Rohrbaugh v. Rohrbaugh,* 136 Ohio App.3d 599, 604–05, 737 N.E.2d 551 (7th Dist.2000). In order to warrant the abrupt disruption of the child's home life, the change in circumstances must be one "of substance, not a slight or inconsequential change." *Flickinger,* supra at 418. "The purpose of requiring a finding of a change in circumstances is to prevent a constant re-litigation of issues that have already been determined by the trial court. * * * Therefore, the modification must be based upon some fact that has arisen since the prior order or was unknown at the time of the prior order." *Brammer v. Brammer,*

194 Ohio App.3d 240, 2011-Ohio-2610, 955 N.E.2d 453, ¶ 17 (3rd Dist.), citing R.C. 3109.04(E)(1)(a).

{¶40} In the case sub judice, the Magistrate found that appellee had established that there had been a change in circumstances. The Magistrate noted that Nikson, who previously had been retained in the first grade, could not be retained again and did not successfully progress to the second grade, but was "placed" in the second grade. She found this to be a major change in circumstances. We agree. The Magistrate further found that Nikson was not progressing academically and had behavioral problems. As noted by the Magistrate, appellant "admitted that she did not get any tutoring for Nikson the summer of 2014 between 1st and 2nd grade, even though she knew he was extremely behind in his school work." At the hearing, the GAL indicated that she had had "grave concerns" about Nikson's academic process and opined that Nikson needed immediate intervention. Finally, in an updated report filed on December 30, 2014, the GAL indicated that appellant was in the process of being evicted.

{¶41} We find, based on the foregoing, that sufficient evidence was presented to find that the trial court did not abuse its discretion in finding a change in circumstances warranting a reallocation of parental rights. The trial court's decision was not arbitrary, unconscionable or unreasonable. Appellants' first assignment of error is, therefore, overruled.

{¶42} Appellant also argues that the trial court abused its discretion in finding that a change of custody was in Nikson's best interest. If a change of circumstances is established, the trial court must weigh the best interest of the children before modifying a

residential-parent designation. R.C. 3109.04(F), which sets forth the factors a trial court must consider in determining the best interest of the child, provides as follows:

{¶43}  In determining the best interest of a child pursuant to this section, whether on an original decree allocating parental rights and responsibilities for the care of children or a modification of a decree allocating those rights and responsibilities, the court shall consider all relevant factors, including, but not limited to:

{¶44}  (a)   The wishes of the child's parents regarding the child's care;

{¶45}  (b)   If the court has interviewed the child in chambers pursuant to division (B) of this section regarding the child's wishes and concerns as to the allocation of parental rights and responsibilities concerning the child, the wishes and concerns of the child, as expressed to the court;

{¶46}  (c)   The child's interaction and interrelationship with the child's parents, siblings, and any other person who may significantly affect the child's best interest;

{¶47}  (d)   The child's adjustment to the child's home, school, and community;

{¶48}  (e)   The mental and physical health of all persons involved in the situation;

{¶49}  (f)   The parent more likely to honor and facilitate court-approved parenting time rights or visitation and companionship rights;

{¶50}  (g)   Whether either parent has failed to make all child support payments, including all arrearages that are required of that parent pursuant to a child support order under which that parent is an obligor;

{¶51}  (h)  Whether either parent or any member of the household of either parent previously has been convicted of or pleaded guilty to any criminal offense involving any act that resulted in a child being an abused child or a neglected child * * *;

{¶52}  (i)   Whether the residential parent or one of the parents subject to a shared parenting decree has continuously and willfully denied the other parent's right to parenting time in accordance with an order of the court;

{¶53}  (j)   Whether either parent has established a residence, or is planning to establish a residence, outside this state.

{¶54}  We find no abuse of discretion in the trial court's conclusion that it was in Nikson's best interest to name appellee the primary residential parent and that the advantages of a change of placement outweighed any harm likely to be caused by the change. There was testimony in this case that Nikson needed immediate one-on-one attention and that seven of appellant's children were residing with her. As is stated above, in January of 2015, appellant was in the process of being evicted and had financial problems.  The GAL testified that only appellee had the time and resources to get Nikson up to speed and that the only current option was for appellee to be granted legal custody.

{¶55}  Appellant's second assignment of error is, therefore, overruled.

{¶56} Accordingly, the judgment of the Tuscarawas County Court of Common Pleas, Juvenile Division, is affirmed.

By: Baldwin, J.

Hoffman, P.J. and

Delaney, J. concur.