[Cite as *Malone v. Malone*, 2011-Ohio-2096.]

-

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## SENECA COUNTY

PATRICK R. MALONE,

    PLAINTIFF-APPELLEE,                 CASE NO. 13-10-39

    v.

WENDY L. MALONE, NKA REESE,
                                    O P I N I O N

    DEFENDANT-APPELLANT.

Appeal from Seneca County Common Pleas Court
Domestic Relations Division
Trial Court No. 06-DR-0067

**Judgment Affirmed**

**Date of Decision:   May 2, 2011**

APPEARANCES:

    *Dale M. Musilli* **for Appellant**

    *Dean Henry* **for Appellee**

**WILLAMOWSKI, J**.

{¶1} Defendant-Appellant, Wendy L. Malone, n.k.a. Wendy Reece ("Wendy" or "Mother"), appeals the post-divorce decision of the Seneca County Court of Common Pleas, Domestic Relations Division, modifying parental rights and responsibilities and designating Plaintiff-Appellee, Patrick R. Malone ("Patrick" or "Father"), as the residential parent of the parties' two minor sons. On appeal, Wendy contends that there was no significant change in circumstances warranting a change in custody; that the trial court erred in excluding evidence on the basis of hearsay objections; and that the trial court's decision was an abuse of discretion and was against the manifest weight of the evidence. For the reasons set forth below, the judgment is affirmed.

{¶2} Wendy and Patrick were divorced on December 4, 2006. Wendy was designated the residential parent of Damian (born in August of 1996) and Dalton (born in March of 2001). Patrick was granted visitation in accordance with the local rules, plus Patrick was granted one additional weekend per month.

{¶3} Prior to early 2009, Damian and Dalton enjoyed what was reported as a "healthy relationship with their father." (Apr. 28, 2010 J.E., p. 229.) Patrick enjoyed regular, frequent and uninterrupted parenting time with his sons and both parties testified that there were very few problems with visitation and parenting

time.   No motions were filed regarding visitation and the boys and their father enjoyed what was described as a "normal father-son relationship."  (Id.)

**{¶4}** In June of 2008, Patrick married Terry Malone ("Terry" or "the stepmother").  In the latter part of 2008, Wendy met Todd Reese ("Todd" or "the stepfather").  They became engaged, and later married.  During the summer of 2009, Wendy and her sons moved from Marion, Ohio, to Todd's home in Galion, Ohio, and the boys changed schools.  Beginning in the spring and summer of 2009, problems began to occur regarding Patrick's parenting time with his sons and the boys allegedly claimed that they no longer wanted to see their father.

**{¶5}** On April 30, 2009, Wendy filed motions seeking an emergency order suspending visitation relating to conflicts with Patrick when Damian was hospitalized with pneumonia and she tried to prohibit Patrick from visiting his son at the hospital.  She also filed a motion to limit parenting time in the future, claiming that the boys were refusing visits to their Father's and that the current parenting schedule needed to be suspended until counseling could address the issues.  Patrick filed a motion to show cause, alleging denial of parenting time.  An attorney guardian ad litem ("GAL"), Kent Nord, was appointed on May 28, 2009.  Both parties filed pretrial discovery and motions relating to parental rights and responsibilities, child support, and other issues.

{¶6} Wendy then tried to have visitation with Patrick stopped because the boys supposedly claimed they had been "inappropriately touched" by the stepmother's nieces during their visitation times with Patrick. Visitation throughout the summer and fall was extremely contentious and numerous motions and orders were filed. Even when Patrick was allowed to have visitation, Damian told the GAL that, between phone calls and texts, he talked to his mother over twenty times a day. (GAL report, p. 6.) On September 4, 2009, Patrick filed a Motion for Reallocation of Parental Rights and Responsibilities, asking the trial court to designate him the residential parent of Damian and Dalton. Dalton then claimed that he had been the victim of serious sexual abuse involving Patrick and his stepmother.

{¶7} Wendy then sought a Civil Protection Order[1] ("CPO") and visitation was halted, except for a few supervised sessions at Patchwork House. All of the allegations of sexual abuse turned out to be completely unfounded and Dalton eventually recanted his accusations during a second in camera interview following

---

[1] Wendy sought protection from Patrick for the children because of the allegations of sexual abuse, and also for herself, because she claimed Patrick had threatened to kill her. An ex parte CPO was issued by the Crawford County Court of Common Pleas on October 2, 2009, and a full hearing was held a few weeks later. The ruling on the CPO on behalf of the minor children was to be held in abeyance pending a determination by the Seneca County Domestic Relations Court in the matter currently before us. Wendy's petition for a CPO for herself was dismissed after a finding that Wendy had failed to demonstrate that Patrick had ever placed her in fear of imminent serious physical harm. The magistrate found that Wendy had "engaged in what is, at best, an exaggeration of any level of danger that may have existed."

the first day of the hearing.[2]

{¶8} A hearing on the pending motions was conducted over six days: December 21st and December 22nd in 2009; and January 7th, January 14th, February 12th, and February 25th in 2010. The trial court heard testimony from many witnesses from both sides, including the children's teachers, Wendy, Patrick, Damian, Dalton, and the GAL. The GAL testified that he had spent over 130 hours on this assignment and conducted approximately forty interviews. He also submitted his report containing his conclusion and recommendation that "it is in the best interest of Damian and Dalton Malone that they be placed in the legal custody of Father, Patrick Malone." (Pl. Ex. 7, p. 27.) The GAL acknowledged that Damian's and Dalton's stated preference was to live with their mother, but he also testified that, "[m]y opinion is that these two boys will do and say anything that their mother wants them to say." (Tr., p. 1071.) The GAL reported that, although the boys always indicated that they did not want to go to their Father's home and that they never had any fun there, "[t]hat is not what this GAL observed

[2] The allegations of inappropriate touching were investigated by the Crawford County Children's Services, and no evidence of sexual abuse was found. Dr. Smalldon, a forensic psychologist, was also hired to investigate Dalton's charges of abuse by Patrick and his stepmother. On December 18, 2009, Dr. Smalldon issued his final report stating that he did not find the abuse allegations against Patrick and the stepmother to be reliable, or even plausible. Dalton's story was continually changing, and his allegations were so outrageous that it was difficult to find them believable. On December 21, 2009, after the first day of the hearings, another in camera interview was held with Darian and Dalton and the boys recanted all of the allegations of sexual abuse and impropriety. During that in camera interview, the boys stated that Wendy had helped them to fabricate the stories. However, at the hearing, both Darian and Dalton testified that no one had helped them make up the allegations, and that they had done it completely on their own.

when he was present with the boys at Father's home and what the boys indicated during their in camera interview." (Pl. Ex. 7, p. 6-7.)

{¶9} On April 28, 2010, the trial court filed its Journal Entry designating Patrick as the residential parent of Damian and Dalton. Wendy was designated the non-residential parent and allocated parenting time. In a lengthy and detailed decision, the trial court outlined the many significant changes in circumstances that had occurred since the parties' divorce in 2006 "which have had a material adverse effect on Damian and Dalton." (Apr. 28, 2010 J.E., p. 228.) The trial court also analyzed how the modification would serve the best interests of Damian and Dalton pursuant to the relevant factors in R.C. 3109.04(F)(1).

{¶10} On September 21, 2010, the trial court issued its final Journal Entry, deciding the issues of child support, cash medical support, and the transportation of the minor children. Wendy was ordered to pay child support pursuant to the child support worksheet. Wendy now appeals, raising the following four assignments of error.

## First Assignment of Error

**The trial court erred as a matter of law by sustaining objections to testimony on the basis of hearsay.**

## Second Assignment of Error

**The trial court abused its discretion by awarding custody to [the Father.]**

**Third Assignment of Error**

**The trial court erred as a matter of law in modifying custody, because there was no significant change in circumstances of the children.**

**Fourth Assignment of Error**

**The decision of the trial court was against the manifest weight of the evidence.**

{¶11} In order to facilitate our review, we shall address the assignments of error out of order and combine our discussion of similar issues. The modification of parental rights and responsibilities is controlled by R.C. 3109.04(E). R.C. 3109.04(E)(1)(a) creates a rebuttable presumption in favor of retaining the residential parent. *Rohrbaugh v. Rohrbaugh* (2000), 136 Ohio App.3d 599, 604, 737 N.E.2d 551. Therefore, a court shall not modify a parenting decree allocating parental rights unless it finds that, based on facts that have arisen since the decree, there has been a change in circumstances of the child or the child's residential parent and modification of the decree is necessary to serve the child's best interest. R.C. 3109.04(E)(1)(a).

{¶12} Additionally, the court must find that one of the factors listed in R.C. 3109.04(E)(1)(a)(i), (ii), and (iii) applies. In this case, the trial court found that R.C. 3109.04(E)(1)(a)(iii) applied: "[t]he harm likely to be caused by a change of

environment is outweighed by the advantages of the change of environment to the child."

**{¶13}** Custody issues are some of the most difficult decisions a trial judge must make. Therefore, those decisions rest within the sound discretion of the trial court. *Davis v. Flickinger*, 77 Ohio St.3d 415, 418, 1997-Ohio-260, 674 N.E.2d 1159; *Miller v. Miller* (1988), 37 Ohio St.3d 71, 74, 523 N.E. 2d 846. A court's decision regarding an award of custody is subject to reversal only upon a showing of an abuse of that discretion. Id.; *Trickey v. Trickey* (1952), 158 Ohio St. 9, 13-14, 102 N.E.2d 772. "A reviewing court will not overturn a custody determination unless the trial court has acted in a manner that is arbitrary, unreasonable, or capricious." *Pater v. Pater* (1992), 63 Ohio St.3d 393, 588 N.E.2d 794.

**{¶14}** The reason for this standard of review is that the trial judge is in the best position to view the demeanor, attitude, and credibility of each witness and to weigh the evidence and testimony. *Davis* at 418. This is especially true in a child custody case, since there may be much that is evident in the parties' demeanor and attitude that does not translate well to the record. Id. at 419.

**{¶15}** In applying an abuse of discretion standard, a reviewing court is not free to substitute its judgment for that of the trial court. *Hay v. Shafer*, 3d Dist. No. 10-10-10, 2010-Ohio- 4811, citing *Holcomb v. Holcomb* (1989), 44 Ohio

St.3d 128, 541 N.E.2d 597. When reviewing a change of child custody proceedings, an appellate court should be guided by the presumption that trial court's findings were correct. *Miller* at 74.

*Third Assignment of Error*

{¶16} In her third assignment of error, Wendy asserts that the trial court erred in modifying custody because she maintains that there was no significant change in circumstances. Although the trial court found that the visitation difficulties that had arisen "were the result of deliberate actions on the part of Wendy to deny Patrick meaningful parenting time with his sons," (J.E. at p. 229), Wendy claims that when the boys did not want to go with their father, she coaxed and encouraged them to go. Furthermore, she contends that there was little evidence to support the trial court's conclusion that Todd's involvement with the boys had negatively affected their relationship with their father. And finally, she states that some of the other problems cited by the trial court had existed since the time of the divorce and did not constitute a change of circumstances.

{¶17} In order for a trial court to modify a prior allocation of parental rights and responsibilities, it must make a threshold finding that a change in circumstances has occurred, and, if so, it must then determine that the modification is in the best interest of the child. R.C. 3109.04(E)(1)(a); *Wooten v. Schwaderer*, 3d Dist. No. 14-08-13, 2008-Ohio-3221, ¶3. The statute's language

does not require a "substantial" change in order to warrant a change of custody, but "the change must be a change of substance, not a slight or inconsequential change." *Davis*, 77 Ohio St.3d at 418. While courts must be mindful to avoid subjecting children to a tug-of-war between two parents continually attempting to gain custody, the threshold for change must not be set so high as to prevent a trial judge from modifying custody if it is necessary for the best interest of the child. Id. at 420-21. See, also, *Wyss v. Wyss* (1982), 3 Ohio App.3d 412, 416, 445 N.E.2d 1153, 1157. This Court has stated:

> **"In determining whether a change in circumstances has occurred so as to warrant a change in custody, a trial judge, as the trier of fact, must be given wide latitude to consider all issues which support such a change, including a change in circumstances because of the child's age and consequent needs, as well as increased hostility by one parent (and that parent's spouse) which frustrates cooperation between the parties on visitation issues."**

*Clark v. Smith* (1998), 130 Ohio App.3d 648, 654, 720 N.E.2d 973, quoting *Davis* at 416-417.

{¶18} The trial court found that there were numerous changes that had occurred in the lives of the children and their parents. Both parents remarried. A new residence and new school system created an entirely new environment for the children. However, the trial court was most disturbed by the changes in attitudes and behavior exhibited by the children that began around the time Todd entered

the boys' lives.  In addition to Wendy's efforts to deny visitation, the trial court

observed:

> **Damian and Dalton's respective behaviors and attitude toward their father, even their recognition of Patrick Malone *as* their father, have suffered to the point that the relationship between these boys and their father has been damaged significantly.  \*\*\* For example, Dalton fabricated a story alleging unbelievable allegations of sexual abuse at the hands of his father and step-mother.  While he later recanted these allegations, questions remain about their source and motive.  Damian has, in the past, stated that Todd, and not Patrick, is his real father.  Damian has frequently and recently signed his last name as "Reese" rather than "Malone."  He calls his father by his first name, while referring to Todd Reese as his "real dad."  \*\*\***

(J.E. at 230.)

{¶19} The trial court was also concerned about the mental and physical

health of Damian and Dalton, which appeared to have deteriorated while they

resided with their Mother.  Damian was recently diagnosed with Type II Diabetes.

At thirteen years of age, he weighed 269 pounds, the heaviest he had ever been.

Although Wendy testified that the doctor recommended Damian be put on a diet,

he has actually gained weight and she apparently has done very little to encourage

him to exercise.  Both children have mental health issues.  Damian's temper

tantrums have increased from 2006 to 2008, and head-banging behavior began in

April of 2009.  Damian was also diagnosed as potentially having Asperger's

syndrome, and Dalton was recently diagnosed with ADHD.

{¶20} There was also a substantial negative change in Damian's educational and social functioning, including poor grades, poor attitude, lack of interaction with other students, and similar issues. Wendy had directed the school authorities to prohibit Patrick from accessing Damian and Dalton's school records and from picking them up after school. The court did note that Wendy's involvement with the school increased significantly while the hearing was in progress and the boys were making some recent positive academic progress.

{¶21} The Ohio Supreme Court has stated that "[w]hile a new marriage, alone, usually does not constitute a sufficient change in circumstances, a new marriage that creates hostility by the residential parent and spouse toward the nonresidential parent, frustrating attempts at visitation, may be an unforeseen change in circumstances warranting further inquiry into the best interest of the child." *Davis* at 420. The record shows most of the changes occurred around the time Todd came into Wendy and the boys' lives, and it was replete with instances of hostility by Wendy toward Patrick.

{¶22} We do not find that the trial court abused its discretion in finding that there were multiple changes in the lives of the residential parent and the children that would warrant an examination into what allocation of parental rights and responsibilities would be in the children's best interests. Wendy's third assignment of error is overruled.

*First Assignment of Error*

**{¶23}** Wendy complains that she was unable to fully explain her reasons for attempting to restrict the boys' visitations with Patrick because the trial court sustained hearsay objections from opposing counsel on at least five occasions and excluded two exhibits.[3] Wendy contends that the intended testimony was not being offered for the truth of the content, but rather to demonstrate that she was merely trying to protect the boys and was acting on the advice of counselors and attorneys when she denied Patrick visitation. Therefore, she claims that the erroneous exclusion of this testimony was the reason that the trial court found that Wendy "failed to provide this Court with any evidence that her repeated denials of parenting time were warranted." (J.E. at 239.)

**{¶24}** A trial court has broad discretion in determining the admissibility of evidence, "so long as such discretion is exercised in line with the rules of procedure and evidence," *Hocker v. Hocker*, 171 Ohio App.3d 279, 2007-Ohio-1671, 870 N.E.2d 736, ¶30, quoting *Rigby v. Lake Cty.* (1991), 58 Ohio St.3d 269, 271, 569 N.E.2d 1056. Accordingly, an appellate court reviewing the trial court's admission or exclusion of evidence must limit its review to whether the lower

---

[3] Defendant's Exhibits O and P, which were proffered, were letters from Wendy's former attorney written to Patrick's attorney, stating that Wendy would not be allowing the boys to exercise visitation due to a letter from the boys' counselor concerning inappropriate touching.

court abused its discretion. *Moore v. Moore*, 182 Ohio App.3d 708, 2009-Ohio-2434, 914 N.E.2d 1097, ¶15.

**{¶25}** "Hearsay" is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Evid.R. 801(C). Evid.R. 801(D) also specifies certain statements which are not considered hearsay, such as when the declarant testifies at trial or hearing and is subject to cross-examination concerning the statement. See Evid.R. 801(D)(1). Generally, hearsay is not admissible unless one of several exceptions to the hearsay rule is applicable. See Evid.R. 802-807.

**{¶26}** During the hearing, there were frequent instances when some of the witnesses, especially Wendy, would find it difficult to answer questions without attempting to relate something that someone else had said, i.e., hearsay. The trial court was diligent in allowing the attorneys to explain their legal reasoning as to why the testimony should or should not be allowed and then it carefully and consistently ruled on the many hearsay objections raised by both sides. The record demonstrates that the trial court's rulings were not in any way arbitrary, unreasonable, or capricious.

**{¶27}** Contrary to Wendy's assertion, the letters and testimony were being offered for the truth of the matter asserted, i.e., that counselors and her attorney had advised her not to allow visitation. Yet, at trial, Wendy failed to produce any

-14-

witness who provided her with advice to deny Patrick parenting time with his children. Patrick's attorney also objected to the lack of foundational basis providing for the underpinnings of why the two excluded letters (Exhibits O and P) were written, arguing that the letters may have been written in response to his client telling him the boys had been sexually abused. (Tr. at p. 708.)

{¶28} Wendy's attorney argued that the hearsay statements and letters needed to be admitted to explain her motivation for denying visitation. However, there were many other times during the hearing when Wendy did have the opportunity to testify and explain her actions and motivation without invoking a hearsay objection. For example, during her direct testimony concerning the first time she took the boys to seek counseling in June 2009, Wendy testified as follows:

> **Q. Did you get a copy of Exhibit N from [the counselor]?**
>
> **A. Yes, I did.**
>
> **\*\*\***
>
> **Q. Okay. And in response to what was in that Exhibit N, did you do anything in reference to visitation with Patrick?**
>
> **B. Yes. I quit visitation due to the investigation that was going on due to the allegations Dalton made against the two [nieces].**

(Tr. at p. 775-76.)

{¶29} Furthermore, Exhibit N, which was admitted without objection, was a June 15, 2009, letter from the boys' first counselor[4] to Wendy's attorney stating that she was "hesitant" to have the boys go to their father's house until some answers were given for the allegations of inappropriate touching by the nieces and the matter was investigated. Wendy also had the opportunity to tell the trial court, on more than one occasion, "I never have stopped [visitation] until the allegations were made by Dalton, and then I was afraid – I was protecting my boys." (Id. at p. 867.)

{¶30} Based on the above, the trial court did not abuse its discretion in sustaining hearsay objections concerning the out-of-court statements and letters from Wendy's first attorney. Wendy's first assignment of error is overruled.

*Second and Fourth Assignments of Error*

{¶31} In these two assignments of error, Wendy claims that the trial court's decision to award custody to Patrick was an abuse of discretion and was against the manifest weight of the evidence. She argues that the trial court's omission of evidence in an unreasonable and arbitrary manner skewed the remaining evidence against her, and thus, was an abuse of discretion. She also contends that the decision was against the manifest weight of the evidence because the record contains considerable evidence that she provided excellent care and

---

[4] At the time of the hearing, testimony revealed that the boys' currently were each seeing their third counselor.

encouragement for the boys. She also submits that Patrick is not often available to the children because of his work, whereas she is not currently working and is always available to the children.

{¶32} When a trial court's decision concerning allocation of parental rights and responsibilities is supported by a substantial amount of credible and competent evidence, such a decision will not be reversed as being against the weight of the evidence by a reviewing court. *Davis*, 77 Ohio St.3d at 418; *Bechtol v. Bechtol* (1990), 49 Ohio St.3d 21, 550 N.E.2d 178, at the syllabus. The trial court's discretion in determining parental rights must remain within the confines of the relevant statutory provisions. *Miller*, 37 Ohio St.3d at 74, 523 N.E.2d 846.

{¶33} We have already determined that there were several changes in circumstances that would satisfy the first requirement of R.C. 3109.04(E)(1)(a). The trial court then reviewed all of the R.C. 3109.04(F) factors to determine what was in the children's best interest. The non-exclusive list of relevant factors in R.C. 3109.04(F) includes:

> **(a)** **The wishes of the child's parents regarding the child's care;**
>
> **(b)** **If the court has interviewed the child in chambers pursuant to division (B) of this section * * *, the wishes and concerns of the child, as expressed to the court;**
>
> **(c)** **The child's interaction and interrelationship with the child's parents, siblings, and any other person who may significantly affect the child's best interest;**

**(d) The child's adjustment to the child's home, school, and community;**

**(e) The mental and physical health of all persons involved in the situation;**

**(f) The parent more likely to honor and facilitate court-approved parenting time rights or visitation and companionship rights;**

**(g) Whether either parent has failed to make all child support payments, including all arrearages, that are required of that parent pursuant to a child support order under which that parent is an obligor;**

**(h) Whether either parent or any member of the household of either parent previously has been convicted of or pleaded guilty to any criminal offense involving any act that resulted in a child being an abused child or a neglected child; * * ***

**(i) Whether the residential parent or one of the parents subject to a shared parenting decree has continuously and willfully denied the other parent's right to parenting time in accordance with an order of the court;**

**(j) Whether either parent has established a residence, or is planning to establish a residence, outside this state.**

R.C. 3109.04(F)(1)(a)-(j). Although the statute provides a list of factors for the trial court to consider in determining the best interest of the child, there is no requirement that the trial court set out an analysis of each factor in its judgment entry, so long as the judgment entry is supported by some competent, credible evidence that the best interest of the child was considered. *Bunten v. Bunten*

-18-

(1998), 126 Ohio App.3d 443, 447, 710 N.E.2d 757, citing *Masitto v. Masitto* (1986), 22 Ohio St.3d 63, 488 N.E.2d 857.

{¶34} In this case, the trial court provided an analysis of the evidence adduced at trial, applying that evidence to each and every factor in R.C. 3109.04, setting forth in precise detail its reasons for reallocating parental rights. The majority of the factors were either neutral in respect to both parties, or weighed against Wendy and in favor of Patrick.

{¶35} The trial court was particularly concerned with Wendy's pattern of denying Patrick parenting time with his sons, and it also found that Patrick was the parent who would be more likely to honor and facilitate visitation. The GAL's recommendation was clearly in favor of naming Patrick as the residential parent, and the trial court took this recommendation into consideration as well.

{¶36} There was contradictory testimony throughout the hearing on many occasions, which would mean that either Wendy or Patrick was not telling the truth. However, the trial court, as the finder of fact, was in the superior position to observe the witnesses' demeanor and assess their credibility. It is not our position to substitute our judgment for that of the trial court on matters of credibility. Patrick's testimony appeared to be reasonable and believable and motivated by a sincere desire to provide what was best for his sons. Much of Patrick's testimony was supported by the forensic psychologist's report and the GAL's observations.

And, although Patrick does work full time, he testified that he had made arrangements for the care of the children by his wife and his parents when he was unable to be there.

{¶37} In contrast, there were many examples where the trial court found Wendy's testimony was not credible or in conflict with the testimony of other witnesses. For example, the trial court stated that "Wendy's testimony that she 'always makes the boys go' with their father is in direct contradiction to her testimony that she stopped visitation. Her actions calling for police or sheriff assistance were not in furtherance of visitation, but to record her feigned pleas to Damian and Dalton to visit their father." (Tr. at p. 241.) Wendy also reported that a parent-teacher conference that she attended with Todd went well and nothing out of the ordinary occurred, whereas the teacher testified that it was the worst parent-teacher conference she had ever had in her 36 years of teaching.

{¶38} Furthermore, as stated in our response to the previous assignment of error, the evidence was not skewed by the exclusion of any evidence. Wendy had many opportunities throughout the hearing to question her witnesses and to explain the motivation behind her actions without resorting to inadmissible hearsay.

{¶39} Based on a thorough review of the record, including more than 1,100 pages of hearing transcripts, the forensic psychologist's report, the GAL's report,

and numerous other exhibits, we do not find that the trial court's decision was an abuse of discretion or against the manifest weight of the evidence. Wendy's second and fourth assignments of error are overruled.

**{¶40}** Having found no error prejudicial to the Appellant herein in the particulars assigned and argued, we affirm the judgment of the trial court.

*Judgment Affirmed*

**SHAW and PRESTON, J.J., concur.**

**/jlr**