[Cite as *Knauss v. Unverferth*, 2020-Ohio-848.]

## IN THE COURT OF APPEALS OF OHIO
### THIRD APPELLATE DISTRICT
### SENECA COUNTY

LACEY MANKIN NKA KNAUSS,

    PLAINTIFF-APPELLEE,

    v.

JOHNATHAN UNVERFERTH,

    DEFENDANT-APPELLANT.

CASE NO. 13-19-12

O P I N I O N

---

**Appeal from Seneca County Common Pleas Court
Juvenile Division
Trial Court No. 20970006**

**Judgment Affirmed**

**Date of Decision:  March 9, 2020**

---

APPEARANCES:

    *Kurt A. Dauterman* for Appellant

    *Drew J. Mihalik* for Appellee

**WILLAMOWSKI, J.**

{¶1} Defendant-appellant Johnathan Unverferth ("Unverferth") brings this appeal from the judgment of the Court of Common Pleas of Seneca County, Juvenile Division, denying Unverferth's motion to modify the parental rights and responsibilities of the parties. Unverferth claims on appeal that the trial court erred by not finding a change of circumstances and by finding the modification to not be in the best interests of the child. For the reasons set forth below, the judgment is affirmed.

*Factual and Procedural Background*

{¶2} In 2007, J.M. was born to Unverferth and plaintiff-appellee Lacey Mankin nka Lacey Knauss ("Knauss"). Doc. 91. In 2014, the parties agreed to a shared parenting plan. *Id.* However, on September 28, 2015, that plan was found to no longer be in the best interests of the child and was modified to name Knauss as the residential parent. *Id.* and Doc. 92. On August 31, 2017, Unverferth filed a motion for contempt alleging that Knauss was not complying with the visitation order. Doc. 129. On that same day Unverferth filed a motion to modify custody and support requesting that he be named the residential parent. Doc. 133. Unverferth claimed that Knauss had engaged in activities designed to undermine his relationship with J.M. and in violation of the prior court order. *Id.* The trial court appointed a guardian ad litem ("GAL") on September 7, 2017. Doc. 135.

-2-

{¶3} On March 21, 2018, a hearing was held on the contempt motion. Doc. 179. The parties had reached an agreement in which Knauss admitted to the violation of the order. *Id.* As a consequence, Unverferth was granted additional parenting time during the 2018 summer. *Id.*

{¶4} The GAL filed his report on July 20, 2018. Doc. 190. In the report, the GAL noted that J.M. had lied about some things and as a result, her summer parenting time in 2017 did not occur. *Id.* at 1. The GAL noted that J.M. lied frequently about many different things and, as a result, was sent to counseling upon the recommendation of the GAL. *Id.* at 2. The GAL noted that the counseling was helping J.M. deal with her struggle to make both parents happy. *Id.* The GAL also noted that both parents attempted to influence J.M.'s opinion of the other, but that both were good with her when they focused on J.M. and not the other parent. *Id.* Regarding the home visits, the GAL indicated that Unverferth's home was appropriate and that J.M.'s needs were met. *Id.* The GAL also indicated that after J.M. had spent part of the summer at Unverferth's house, she was comfortable and bonded with her father, stepmother, and half siblings. *Id.* The GAL noted that during one of the visits, Unverferth was not present and J.M. was only there with her stepmother, Leann Unverferth ("Leann"). *Id.* The GAL described J.M. as relaxed during that visit. *Id.* When the GAL mentioned this to J.M., the response was that J.M. liked Leann and had no issues with her, which was in sharp contrast to the previous summer. *Id.* at 3.

{¶5} The GAL also visited J.M. at Knauss' home. *Id*. The GAL noted that Knauss' home was appropriate and J.M.'s needs were met. *Id*. The GAL found J.M. to be happy and very bonded with Knauss during the first visit. *Id*. However during the second visit, J.M. was very emotional and crying. *Id*. The GAL noted the following.

> **[J.M.] clearly loves her Mother and is very bonded with her. It must be noted at Father's home without him being there, this GAL learned that [J.M.] claims she was told to lie to Children Services about her father and was threatened by Mother if that didn't happen. This GAL is unsure what to believe because she had never said this before not even at school when she was at a neutral location. It must be noted though, that both parents acknowledge that her lying has improved. If this is true, then this causes the GAL concerns. The entire Children Services investigation was based on [J.M.] making statements that she later recanted.**

> **This entire case has involved [J.M.] telling lies. Therefore, it is very hard for this GAL to know what to believe from [J.M.]. This GAL explained to her early on about the boy who cried wolf and now here we are in the same situation as the children's story. What can this GAL believe from her. This GAL is certain both parents love [J.M.]. This GAL is sure that when the parents focus on [J.M.] they are good parents. Further, this GAL believes that both environments are safe for [J.M.]. With all that being said, this GAL believes that either parent if granted custody will in front of the child utilize that distinction to show the other and the child that they have power. This is evidenced [from] the statements made to this GAL and to others the GAL interviewed. This is really unfortunate as the only one hurt in this matter is [J.M.]. [J.M.] has expressed to this GAL on multiple occasions that both parents will fight over custody, power, decisions, etc. This GAL believes that where [J.M.] is located determines what she thinks and how she responds. This is why this GAL believes that to have both parents neutralized will be in [J.M.'s] best interest. The recommendation is unorthodox and strange but**

**albeit this GAL's job is to seek the best interest for [J.M.] and the Guardian's plan accomplishes this objective.**

*Id*. at 3-4. The GAL then recommended that the parties have shared parenting with J.M. switching homes every Sunday at 7:00 pm. *Id*. at 4. The GAL noted that J.M. had indicated she wished to live with both parents and wanted the GAL to decide for her. *Id*. According to the GAL, J.M. is "clearly bonded" with both parents, but the past history indicated that J.M.'s lying behavior was influenced by Knauss. *Id*. at 4-5.

{¶6} Hearings were held on the various outstanding motions on July 26, September 10, and October 15, 2018.[1] Doc. 204. At the hearings, the following pertinent evidence was presented. The GAL testified that if the trial court chose not to order shared parenting as he recommended in his report, he would recommend that Unverferth be named the residential parent. Tr. 8. The GAL spoke with J.M.'s prior teacher, the principal and a school aide. Tr. 12. Those people contacted the GAL to come speak to them with J.M. present. *Id*. The issue raised was an allegation that Knauss was "deliberately taking the tri-fold homework out of the bookbag before it went over to [Unverferth's] house for the overnight that was set up because she was trying to sabotage the relationship between [Unverferth] and J.M.." *Id*. This turned out not to be true and J.M. had been removing the folder

---

[1] Besides the modification of custody motion, there were outstanding contempt citations filed by both Knauss and Unverferth. All were denied. Doc. 200-203.

because she did not want to do the homework and had lied about it. Tr. 13. When the GAL asked J.M. why she had lied about her stepmother in 2017, she told the GAL that Knauss had pushed her to tell the lie. Tr. 14. However, both parents had indicated prior to the hearing that J.M. was no longer lying. Tr. 18. The GAL felt that counseling was a part of this change. *Id.* Unverferth requested the counseling, but Knauss made the appointment when the GAL presented the idea to her. *Id.*

{¶7} In the Spring of 2018, J.M. had lied and said that Unverferth had been driving after drinking and Knauss told the GAL about it when a children's services investigation was opened. Tr. 21. The GAL spoke with the investigator and told her about J.M.'s habit of lying and the investigator went to Knauss' home to speak with J.M.. Tr. 22. At that time, J.M. admitted that it had not happened. *Id.* Since then, the GAL has seen J.M. develop a strong bond with Unverferth. Tr. 24.

{¶8} J.M. has struggled in her language arts, science, and math classes. Tr. 29. Unverferth had mentioned his concern with J.M.'s grades from the beginning of the GAL's involvement with the case. *Id.* The GAL also testified that Unverferth's home had more structure and that J.M. was very comfortable with Leann. Tr. 33. J.M. was very bonded with her father and very comfortable in the home. Tr. 33-34. J.M. was also very bonded with her mother. Tr. 48. Right before the hearing, J.M. had told her counselor and the GAL separately that she wanted to live with her father and attend Cory Rawson schools. Tr. 16. The GAL indicated that both homes were appropriate for J.M. and that he had no concerns about

Unverferth's driving while intoxicated conviction from a few years ago because everyone he spoke with indicated that Unverferth did not drink any more. Tr. 19. J.M.'s answer about where she wants to live has consistently changed throughout the case depending on where she is staying, but she is more relaxed at Unverferth's home. Tr. 20. When he last visited at Knauss' home, J.M. was emotional and cried. Tr. 21.

{¶9} Tecky Rusk ("Rusk") testified that she is a mental health counselor in Findlay and provided services to J.M.. Tr. 51-53. J.M. had been diagnosed with adjustment disorder with a mixed disturbance of emotions. Tr. 53. J.M. "was overwhelmed and she had behavioral issues, emotional regulation problems." Tr. 54. The current treatment plan was developed with the input of both Knauss and Unverferth. Tr. 61. Unverferth has indicated that he would like to do family counseling involving both parents and step-parents. Tr. 56. At the session immediately preceding the hearing, J.M. stated that she wanted "to live with dad and go to Cory Rawson." Tr. 57. She also still wanted to see Knauss. *Id*. J.M. has a strong bond with both parents and did not want to hurt either one, which caused her to be tearful in the session while discussing her preferences. *Id*.

{¶10} In the June 4 session, J.M. told Rusk that J.M. had lied about Unverferth driving drunk while she was in the car and that her "mother had been forcing her to make things up about her father to cause problems with the custody battle." Tr. 58. Previously J.M. had told her that Unverferth was driving drunk

while J.M. was in the car, which resulted in Rusk reporting it to Children's Services. Tr. 59-60. Rusk testified that she had notified Knauss about the allegation of Unverferth driving while intoxicated and Knauss told her that Unverferth had a history with drinking. Tr. 63. After J.M. told Rusk she had lied about that incident, they discussed how the lying affects relationships and the trust they have. Tr. 60.

{¶11} Jessica Ottney ("Ottney") identified Exhibit B as a copy of J.M.'s last grade card. Tr. 71. J.M. had perfect attendance, but had issues with math. Tr. 71-72. At the beginning of the school year, Ottney only had contact with Knauss, then started to have contact with both parents. Tr. 72. Her grades in both math and science ranged from Ds to a B. Tr. 75-76. They improved over the year. Tr. 76. Ottney held a conference with both parents present and it was stressful. *Id.* Both parents then requested that future conferences be held separately. Tr. 77. Ottney did not notice any difference in homework completion between the homes. Tr. 84.

{¶12} Knauss testified as on cross-examination that the prior shared parenting agreement was terminated in 2014. Tr. 93. She was not sure how she learned that J.M. had been lying about Leann regarding the July 2017 incident. Tr. 107. J.M. never told Knauss that it was a lie. Tr. 108. Knauss testified that she had spoken to J.M. about how the lying was bad. *Id.* The first indication that J.M. was telling "big" lies was the lie about Leann. Tr. 110. Outside of that lie, J.M.'s lies were little ones about household chores or completing homework. Tr. 111. Knauss only became aware of the lie about the homework being complete when the GAL

informed her. *Id.* Knauss just assumed that J.M. had completed it, but failed to turn it in to the teacher. *Id.* Knauss did not ask J.M. about the missing assignments. *Id.*

**{¶13}** Knauss admitted that although she had a protection order against the stepmother which did not include Unverferth, she still withheld visitation. Tr. 109. Knauss was unsure whether she ever communicated with Unverferth about the denial of the visitations. *Id.* Knauss admitted that she refused to communicate directly with Unverferth about the visits throughout the summer of 2017, not even if the message was sent via text or email. Tr. 110. Knauss admitted that J.M. likes spending time with her father, but denied that she is close to Leann. *Id.* Knauss also admitted that she "used to" have animosity towards Unverferth and Leann. Tr. 112. Knauss admitted that J.M. likes her summer visitation with her father and Leann, including the trips to Michigan to visit Leann's family. Tr. 114. Once the CPO against Leann was filed, Knauss filed a motion to modify custody to reduce Unverferth's visitation. Tr. 115. The motion was denied at the end of July, but Knauss still did not allow any visitation until August 23. Tr. 115-16. Knauss admitted that Unverferth was the first to suggest counseling and it was started in October of 2017. Tr. 116-17.

**{¶14}** Knauss acknowledged that Unverferth had requested his extended summer visit to start on July 18, 2017. Tr. 126. Knauss filed the CPO request on July 6, 2017. *Id.* Knauss admitted that although Unverferth had requested visitation after the trial court denied her motion to modify visitation, she still refused to allow

it. Tr. 129. According to Knauss she told J.M. that if she wanted to live with her father, she just needed to tell everybody. Tr. 131. Knauss testified that she was not upset about J.M.'s statement to the GAL that she wished to live with Unverferth. Tr. 137. Knauss admitted that she did not tell the counselor that J.M.'s lying was a big problem that needed to be addressed when counseling started. Tr. 138. Knauss also admitted that she shares custody of another child with her ex-husband and they change every other week, but has not considered it for J.M.. Tr. 162. Over her five years in school, J.M. has attended four different schools. Tr. 167. She is an active child who easily makes friends. *Id.*

{¶15} On examination by her own counsel, Knauss indicated that her preference would be for J.M. to remain in her household and continue school at Fostoria. Tr. 140. In addition to J.M., Knauss has an eight year old and twin one year olds. Tr. 147. The children are bonded with each other and J.M. is also bonded with Knauss' husband. Tr. 148. Knauss also testified that she facilitates visitation between J.M. and her paternal grandmother. Tr. 151. Knauss testified that she would like to see J.M. stop lying and wants her to continue with counseling. Tr. 156. Knauss indicated that she thought J.M. needs a counselor who is "a little bit better." *Id.* Knauss testified that J.M. was very attached to her friends in the community and attends church there. Tr. 157. Knauss believes that as J.M. gets older she should be with her mother so they can talk about issues that will arise as she gets older. Tr. 158.

{¶16} Daniel Vekaryasz ("Daniel") testified that he is Leann's father, so J.M. would be his step-granddaughter. Daniel testified that he is familiar with J.M. and her two half-siblings because they come over to swim in his pool with Unverferth and Leann during the summer. Tr. 175-76. From 2014 until 2018, J.M. seemed uneasy around the family, but this year she became comfortable. Tr. 177-79. Since J.M. was caught lying about Leann, there had been a change in her attitude towards Unverferth and Leann. Tr. 183. J.M. is more affectionate and does not hesitate to speak to either of them about anything. *Id*. Additionally, J.M. has opened up to Daniel and his wife and they now have a great relationship. Tr. 183-84.

{¶17} Eileen Vekaryasz ("Eileen") testified that she is Leann's mother and J.M. is her step-granddaughter. Tr. 186-87. Eileen testified that in 2017, J.M. was not happy around her father and would hesitate to answer questions as if she was waiting for someone to tell her the answer. Tr. 187. When Eileen would ask J.M. what she wanted about anything, such as what she wanted to eat, J.M. would hesitate as if waiting for someone to tell her because she did not know. Tr. 187-88. Eileen sees J.M. almost every time she is with Unverferth. Tr. 188. J.M. makes friends easily and enjoys playing with the other kids around Eileen's home. Tr. 189. Throughout the time Eileen has known J.M., J.M. has told lies. Tr. 190. In the summer of 2018, Eileen noticed that J.M. seems happier and more confident, she is excited, and appears more comfortable with herself. *Id*. J.M. appeared to be content

when she is at Unverferth's home. Tr. 191. Also in the last year, Eileen has noticed that J.M.'s lying is getting better and J.M. is trying to be honest now. Tr. 194.

{¶18} Leann testified that she is J.M.'s stepmother. Tr. 203. When she first started dating Unverferth in 2013, he and Knauss shared custody of J.M. with them switching every week. Tr. 204. At that time, J.M. was a typical child with no issues, but over the next couple of years, J.M.'s lying and attitude became progressively worse. Tr. 205. She started with lying about simple things and then began lying about "major things." *Id.* The lying reached its peak in 2017. Tr. 206. At that time, J.M. appeared very withdrawn and did not want to participate in the household. *Id.* The worst lie J.M. told was when she told Knauss that Leann had choked her. Tr. 207. Knauss then obtained an ex parte CPO against Leann on July 6, 2017, but it was subsequently denied on August 9, 2017, after a full hearing. Tr. 208. Unverferth's summer vacation with J.M. was set to begin on July 18, 2017. Tr. 209. However, Knauss would not allow Unverferth to see J.M. until late August of 2017. Tr. 209-210. When J.M.'s visits resumed, she continued to lie and be withdrawn. Tr. 210. J.M. told Leann she had lied to get the CPO soon after the visits resumed. Tr. 212.

{¶19} Since Spring of 2018, J.M. has done a complete "turnaround" and is less withdrawn. Tr. 215. J.M. is a much happier child and is now willing to open up. Tr. 218. The lying has been reduced and she does not have any behavioral

issues. *Id.* Leann testified that she now has a "really good relationship" with J.M. now and that J.M. asks to do things with her. Tr. 219-20.

**{¶20}** Unverferth testified that since September of 2017, Knauss does not respond to attempts at communication. Tr. 249. Knauss keeps the texts very minimal and refuses to meet to discuss being co-parents of J.M.. *Id.* When Unverferth picks up J.M., he is required to park at the end of the driveway, sound the horn, and wait for J.M. to come to the car. Tr. 250. Knauss does not come out to speak with him. If Unverferth calls Knauss' phone, J.M. will answer or Knauss does not answer it. Tr. 253-54.

**{¶21}** Unverferth testified that he has contacted some of J.M.'s doctors only to be refused information because he is not listed as the father on her records. Tr. 254-55. Unverferth identified Exhibit E as a report from J.M.'s eye doctor and the report listed the father as Ben Knauss, J.M.'s stepfather. Tr. 258-59.

**{¶22}** During the time the CPO was in effect against Leann, Knauss did not let J.M. come to visits and refused to allow Unverferth to speak with her on the phone. Tr. 264-65. Despite the fact that the trial court denied the CPO at the beginning of August 2017, Knauss did not allow visitation to resume until the end of August 2017, which was after Unverferth had filed a motion to show cause for denial of visitation. Tr. 268-69. After the CPO was denied, Unverferth attempted to call and text Knauss about visitation, but received no response. Tr. 269. He also went to the house to pick up J.M. on his scheduled visitation days, but she never

came out of the home when he sounded the horn. *Id.* He would wait for "about 30 minutes" to see if she would come to the car. *Id.* In addition to sounding the horn, he would also send Knauss a text that he was there. Tr. 270.

{¶23} On September 10, 2017, Unverferth was scheduled to have J.M. for a visitation. Tr. 272. Unverferth was the best man in a wedding that day, so he arranged with Knauss to switch weekends with the following weekend. *Id.* When he arrived to pick her up on September 17, 2017, J.M. was not allowed to go. *Id.* Similarly for Halloween of 2015, he was supposed to have J.M., but she was not permitted to go with him. Tr. 273. Knauss did not allow him the scheduled visitation because Fostoria's Halloween celebration fell on the same day as the one in his town. *Id.* Knauss took this position despite the local Court Rule stating that it was his year to have J.M. for Halloween. *Id.* For Halloween 2017, Knauss was again attempting to refuse his visitation, but the GAL became involved and J.M. went with Unverferth. Tr. 274.

{¶24} In February of 2018, J.M. alleged that Unverferth had been drinking and then driving her around. Tr. 274-75. Unverferth received a call from Child Protective Services, but the claim was eventually dismissed as unsubstantiated. *Id.* Prior to the GAL getting involved, J.M. never brought homework to Unverferth's home. Tr. 275. J.M. said it was because she was not allowed to bring her book bag to Unverferth's home. Tr. 276. During the first quarter of the 2017-2018 school year, J.M.'s grades were not very good as she was getting Ds in a few subjects. Tr.

278. Unverferth testified that the GAL got involved and Unverferth was given his midweek overnight visit which allowed him to help J.M. with her homework. *Id*. After the GAL and Unverferth got involved, J.M.'s grades improved. Tr. 279. Unverferth obtained copies of J.M.'s grade cards from her teacher because Knauss did not provide them even after he asked. Tr. 280.

{¶25} Unverferth testified that prior to July 6, 2017, J.M.'s behavior with him and Leann was "spotty", that J.M. "would be involved one day and then kind of the next day she wasn't." Tr. 288. During summer visitations prior to 2017, the visits had been "awesome" and enjoyable. *Id*. Then he did not have summer visitation in 2017 because Knauss filed the CPO. *Id*. The visits did not resume until after the motion to modify parenting was filed. *Id*. When the visits did resume, J.M. was "very timid and just kind of timid." Tr. 289. J.M. did apologize to Unverferth for the lies which led to the CPO being filed. Tr. 267. J.M.'s behavior turned around when the GAL became involved and J.M. became like "a different person". Tr. 289. Since September of 2017, Unverferth and J.M. have a "great" relationship. Tr. 290. Over the summer Unverferth enrolled J.M. in cheerleading, which has six games and practice every Tuesday. Tr. 292. Since school started, J.M. has not been able to attend a practice because she is with Knauss on Tuesday. *Id*. Unverferth testified that he asked to switch his Wednesday visitation to Tuesday so that he could take J.M. on his time, but Knauss has not responded. Tr. 293. J.M. only gets to cheer on the games that occur during his visitation. *Id*. Unverferth

testified that the custody order provides that parents will take children to extra curricular activities regardless of when the activity is occurring. *Id*. According to Unferth, J.M. and her half brothers in his home have a good relationship. Tr. 294. Since Spring 2018, J.M. has been trying very hard in school and wants to do better. Tr. 295

{¶26} Unferth testified that if J.M. were to live with him, the worst result would be that she would not see Knauss as much. Tr. 295. J.M. has many friends around his house and enjoys spending time with them. Tr. 295-96. Unferth testified that he pushed for J.M. to be in counseling for a long time, but Knauss did not agree until the GAL became involved. Tr. 296-97.

{¶27} On cross-examination, Unferth admitted that he did not know that Knauss had blocked him from getting information from the school, just presumed such. Tr. 303. However, he testified that he knew that Knauss had listed her husband, not him, as J.M.'s father at the doctor's office. Tr. 304. Unferth admitted that he did not ask Knauss for her consent before enrolling J.M. into cheerleading that had practice on Tuesday nights. *Id*. Unferth also admitted that he had an arrearage in child support due to a change in jobs, but claimed to be making it up. Tr. 305. According to Unferth, Knauss allows him two phone calls with J.M. a week and they last five to ten minutes. Tr. 306. When J.M. is with him for summer visitation, Knauss gets two phone calls a week for 15 minutes each. Tr. 307. Unferth claimed that Knauss restricts his phone calls with J.M.. *Id*.

When asked what homework Unverferth helped J.M. with, he could only specifically recall mathematics. Tr. 309-11. Unverferth admitted that he had not received a bill for J.M.'s counseling, but did not know if Knauss was paying for it. Tr. 316

{¶28} During redirect examination, Unverferth testified that Knauss does not communicate with him about J.M.'s school work, activities, medical issues, or anything else. Tr. 320-21. Unverferth indicated that he has not had a drink in approximately three years. Tr. 321. Additionally, he had never been the subject of allegations of abuse, neglect, or endangering a child. Tr. 322. As to homework, Unverferth indicated that he did not memorize what J.M.'s homework was, but he would help her when she had a question. *Id.* After she completed the homework, he would check her work. Tr. 323.

{¶29} Knauss testified on direct that J.M. had been attending Fostoria Intermediate Elementary School. Tr. 342. Although J.M. was having problems taking tests, Knauss and the teacher were working with J.M. to improve. Tr. 343. Knauss testified that she loved working with J.M. and loved the educational program that J.M. attended. Tr. 345. At the school, J.M. has "quite a few friends." Tr. 346. J.M. likes to "hang out" with them and they have "sleep overs" a couple times a year. *Id.* Knauss testified that J.M. is involved in band and cross-country at school. Tr. 348. Knauss testified that when she receives the notices of meets, she shares them with Unverferth, but he has only come to one meet in three years. Tr.

348-49. J.M. has gone to most meets unless Knauss determined that the weather was not good for J.M. to be running. Tr. 349. J.M. missed her last meet because she was with Unverferth and he did not transport her to the meet. *Id*. For band, J.M. plays the clarinet. *Id*. Additionally, J.M. participates in the choir at church. Tr. 351. J.M. is also hoping to play softball in the spring. Tr. 351-52. She has a provisional spot on the team. Tr. 352.

{¶30} Knauss admitted that she did not permit visitation with Unverferth after she obtained the CPO on J.M.'s behalf against Leann. Tr. 353-54. She testified that it was her intention to protect J.M.. Tr. 354. Knauss testified that she would follow the orders of the court. Tr. 354-55. Knauss indicated that she was happy with the local visitation rules and wished to continue as the residential parent. Tr. 355. Knauss testified that after the GAL became involved, she agreed to give Unverferth additional time that was not ordered by the court. *Id*. According to Knauss, Unverferth unilaterally switched the visits back from overnight to just from five to nine on Wednesday nights because he could not take J.M. to school the next morning. Tr. 356. Knauss testified that J.M. is okay with the visits as they are. Tr. 357. Additionally, Knauss gives visitation to Cathlene Bugner ("Bugner"), who is Unverferth's mother. Tr. 357. Knauss and Bugner get along, so Knauss is fine with her having visitation with J.M.. *Id*. J.M. seems to enjoy her time with Bugner, so Knauss would like it to continue. Tr. 359-60.

{¶31} Knauss testified that J.M. routinely sees her doctor, her dentist, an eye doctor, and her allergist. Tr. 360-362. The bills are paid by Medicaid. Tr. 362. Knauss has no prior convictions for domestic abuse or drug or alcohol abuse. *Id*. J.M. started counseling around August of 2017 and has seen three different counselors. Tr. 366. Knauss testified that she did not specifically consent to Rusk treating J.M.. Tr. 365-66. Knauss does not wish to continue counseling with Rusk and is researching other options. Tr. 367. Knauss testified that she did not feel that Rusk was focused on "what J.M. has as far as issues are concerned." *Id*. According to Knauss, J.M. has issues with stress, anxiety, and lying. Tr. 369. Knauss wants the lying to stop and does not believe that Rusk focuses on that. *Id*. Knauss testified that J.M. and her husband have a bond. Tr. 371. There is also a bond between J.M. and her brothers. Tr. 372-73.

{¶32} On cross-examination Knauss testified that Unverferth was not a party to the CPO. Tr. 376. She also admitted that she did not speak to Unverferth about what happened. *Id*. Knauss testified that after filing for the CPO, she asked the trial court to modify the visitation so that Unverferth would not have any visitation with J.M., but the trial court denied that motion. Tr. 377. Despite the trial court's denial of her motion, Knauss still chose to deny visitation as she felt it was necessary to protect J.M.. *Id*. Knauss indicated that at her house, she had not seen any improvement in J.M.'s lying. *Id*. J.M. usually still lies about her room being clean or where she left her school laptop. *Id*. According to Knauss, J.M. began counseling

before the GAL became involved, but she relied upon the counselor to notify Unverferth. Tr. 381. The first counselor was Marcia and she met with her twice. *Id*. Knauss did not know the second counselor and had never met with that person. *Id*. Knauss has only met Rusk one time. Knauss testified that she has tried to contact Rusk two times, but has not heard anything from her. *Id*. Knauss indicated that she only had Rusk's cell phone number, but no email account. Tr. 381-82.

{¶33} Knauss testified that J.M.'s homework does not go to Unverferth's home because it is finished before she leaves. Tr. 383. If J.M. does not get it finished before she goes, she completes it when she gets back. *Id*. Knauss admitted that she never communicates with Leann about anything, and only communicates with Unverferth because she must. Tr. 384. She admitted that she does not tell him about unfinished homework or projects when J.M. goes to his home for the weekend. *Id*. Knauss testified that she did not give Unverferth the cross-country schedule because she did not have one until they were both emailed it by the coach. Tr. 385. Before receiving the schedule from the coach, she did not tell Unverferth about meets because she did not have a week's notice. Tr. 388. Knauss admitted that Unverferth sent her the cheerleading schedule for the activity in Rawson and admitted that Unverferth attempted to change the weeknight visits to Tuesday as J.M. had an activity in Rawson on Tuesday and an activity in Fostoria on Wednesday. Tr. 390-91. No switch occurred. Tr. 391. Knauss admitted that she did not respond to Unverferth's request and did not contact him about the activities.

Tr. 392. Knauss also admitted that she had never gone to watch J.M. cheer. Tr. 395.

{¶34} As to J.M.'s lying, Knauss testified that she could not pinpoint a date that J.M. started lying on a regular basis. Tr. 409. "It started out small, her saying that her room is not clean or, you know, what little kids do." *Id*. The consequence of lying was that J.M. would be grounded and lose her electronics. *Id*. Knauss testified that J.M. began lying about her homework in the fall of 2017. Tr. 410. The big lie about Leann occurred in July of 2017. Tr. 411. Before the summer of 2017, the lying was not as "big" with the lie about Leann being the "biggest one" J.M. had ever told. *Id*. Before then, the lies were only little lies. Tr. 412. Knauss testified that even after she found out J.M. had told such a "big lie", she did not ground J.M. or give her any consequence. *Id*.

{¶35} Bugner testified that Unverferth is her son. Tr. 415. Bugner described J.M. as her sweet granddaughter and said they have a very close relationship. Tr. 416. When Knauss and Unverferth were together and when they had shared parenting, Bugner had unrestricted access to J.M.. Tr. 418. Eventually, though, Bugner had to file for visitation with J.M. because Unverferth would not allow her visitation during his time. Tr. 419. Bugner testified that Knauss never kept J.M. away from her and has encouraged their relationship. Tr. 420. Bugner indicated that she sees J.M. at Knauss' home and J.M. is comfortable there. Tr. 421. According to Bugner, Knauss is very truthful and Unverferth is not. Tr. 423, 425.

Bugner admitted that she told the GAL that she thought shared parenting was best for J.M.. Tr. 432. Bugner also admitted that she has visitation with J.M. during Knauss' time because Knauss agreed to it in a consent entry before the court. Tr. 433. Bugner indicated that the last time she had spoken to Unverferth or seen him with J.M. was in March of 2017. Tr. 434.

{¶36} In reaching a decision, the magistrate noted that the GAL testified that in the two weeks prior to the July hearing date, J.M. had informed him that she wished to live with Unverferth. Doc. 204. After reviewing all of the evidence, the magistrate determined that there was no change of circumstance that was of consequence regarding J.M.'s welfare. *Id.* The magistrate found that the evidence presented that Knauss had coerced J.M. to lie was not credible and there was no evidence that J.M. "did not have a penchant for lying in September 28, 2015 when the original Order was issued." *Id.* The magistrate also noted that the change in J.M.'s wishes alone was insufficient to find a change of circumstances. *Id.* The trial court adopted the decision of the magistrate on October 25, 2018, the same day it was filed by the magistrate. Doc. 205. On November 6, 2018, Unverferth filed his notice of objections to the magistrate's decision and requested a transcript. Doc. 206. The objections to the decision were filed on January 29, 2019. Doc. 216. Unverferth claimed that the magistrate used the wrong standard of review by requiring the change of circumstances to be substantial or significant, not material and substantiated. *Id.* Unverferth noted that Knauss' denial of visitation was

grounds for a change of circumstances. *Id*. Unverferth argues that even after the trial court denied Knauss' motion to suspend visitation on August 6, 2017, Knauss continued to deny Unverferth visits with J.M. until August 23, 2018. *Id*. Knauss filed her response to the objections on February 11, 2019. Doc. 217. On February 20, 2019, the trial court overruled the objections of Unverferth. Doc. 219. Unverferth filed a timely notice of appeal from this judgment and on appeal raises the following assignments of error. Doc. 220.

### First Assignment of Error

**The court denied [Unverferth's] motion for a change of circumstances to warrant a modification of custody pursuant to [R.C. 3109.04(D)(1)(a)].**

### Second Assignment of Error

**Decision was an abuse of discretion and against the manifest weight of the evidence supporting a change of circumstance and a change of custody to Father to protect and serve the best interests of the minor child.**

### Third Assignment of Error

**The benefit from change of custody to Father as residential parent exceeds the low likelihood of harm.**

*Change of Circumstance*

{¶37} In the first assignment of error, Unverferth claims that the trial court erred by requiring a "significant" change of circumstances rather than one which is "substantiated, continuing, and [has] a materially adverse effect upon the child." *Davis v. Flickinger*, 77 Ohio St.3d 415, 418, 1997-Ohio-260, 674 N.E.2d 1159.

-23-

Modification of a prior decree allocating parental rights is governed by R.C.

3109.04(E)(1)(a), which provides in pertinent part as follows.

> **(E)(1)(a)  The court shall not modify a prior decree allocating parental rights and responsibilities for the care of children unless it finds, based on facts that have arisen since the prior decree or that were unknown to the court at the time of the prior decree, that a change has occurred in the circumstances of the child, the child's residential parent, or either of the parents subject to a shared parenting decree, and that the modification is necessary to serve the best interest of the child.  In applying these standards, the court shall retain the residential parent designated by the prior decree or the prior shared parenting decree, unless a modification is in the best interest of the child and one of the following applies:**
>
> **(i)  The residential parent agrees to a change in the residential parent or both parents under a shared parenting decree agree to a change in the designation of residential parent.**
>
> **(ii)  The child, with the consent of the residential parent or of both parents under a shared parenting decree, has been integrated into the family of the person seeking to become the residential parent.**
>
> **(iii)  The harm likely to be caused by a change of environment is outweighed by the advantages of the change of environment to the child.**

"Under R.C. 3109.04, a trial court, in determining whether a modification of a

decree allocating parental rights and responsibilities is appropriate, must go through

a two-step analysis." *Southern v Scheu,* 3d Dist. Shelby No. 17-17-16, 2018-Ohio-

1440, ¶ 17.  The first step is to determine whether a change in circumstances has

occurred since the prior decree was issued. *Fisher v. Hasenjager*, 116 Ohio St.3d

53, 2007–Ohio–5589, 876 N.E.2d 546, ¶ 33, 36.  Such a change must be one of

substance and have a material effect on the child. *Southern, supra* at ¶ 17. This does not mean that the change is "substantial" or "quantitatively large". *Brammer v. Brammer*, 194 Ohio App.3d 240, 2011-Ohio-2610, 955 N.E.2d 453, (3d Dist.). The second step occurs only after the trial court has found a qualifying change of circumstances. *Southern, supra*. at 18. In that case, the trial court then considers whether modification of the prior decree is in the best interest of the child. *Id*. When reviewing a ruling pertaining to the allocation of parental rights, an appellate court will grant great deference to the decision of the trial court. *Id*.

{¶38} Here, Unverferth claims that the trial court used the wrong standard of review when the magistrate required the change to be "significant." The word significant does not have a specific legal meaning, but it is commonly defined as meaningful or notable. *The American Heritage Dictionary* 1139 (2d Ed. 1985). Some synonyms of significant include "relevant", "important", and "material". Since the trial court is required to find that any change is one of substance and has a material effect on the child, the use of the word significant, as occurred in this case, was not an error. The magistrate did not alter the standard of review, but rather just used an equivalent word to express the correct standard of review. For this reason, the first assignment of error is overruled.

*Abuse of Discretion and Manifest Weight of the Evidence*

{¶39} Unverferth claims in the second assignment of error that the trial court's determination was an abuse of discretion and was against the manifest

weight of the evidence. "When a trial court's decision concerning allocation of parental rights and responsibilities is supported by a substantial amount of credible and competent evidence, such a decision will not be reversed as being against the weight of the evidence by a reviewing court." *Malone v. Malone*, 3d Dist. Seneca No. 13-10-39, 2011-Ohio-2096, ¶ 32. "The trial court's discretion in determining parental rights must remain within the confines of the relevant statutory provisions." *Id.* "This court will not substitute its judgment for that of the trier of fact when there is evidence in the record to support the trial court's decision." *Clyborn v. Clyborn*, 93 Ohio App.3d 192, 196, 638 N.E.2d 112 (3d Dist. 1994).

{¶40} In this case, the trial court determined that there was no qualifying change of circumstances. Unverferth argues that the evidence shows there was a change based upon 1) Knauss' inconsistent and self-serving testimony, 2) J.M.'s lying, 3) the denial of visitation; 4) poor academic performance by J.M., and 5) J.M.'s statement that she wished to live with her father. The trial court reviewed the findings of the magistrate de novo and the transcript and determined that there was not a change of circumstances significant enough to warrant a change of custody. Doc. 219. Specifically, the trial court noted that J.M.'s lying was not a new factor and was one they knew of at the last hearing. *Id.* The trial court also

found that J.M.'s academic performance was more a result of J.M. than of Knauss.[2]
*Id.* The trial court determined that the denial of visitation was not sufficient to justify a change of circumstances. *Id.* Finally, the trial court noted that the magistrate was in a better position to judge credibility, and found "no basis not to trust the trier of fact on matters of credibility and demeanor." *Id.* Some credible evidence was found on each of these issues on both sides of the argument. Since there was some credible evidence that supported the trial court's determination, this court cannot substitute its judgment for that of the trial court. For that reason, we do not find the trial court's judgment to be an abuse of discretion or against the manifest weight of the evidence. The second assignment of error is overruled.

*Best Interest of the Child*

{¶41} Finally, Unverferth claims that the trial court should have found that the benefit of a change of custody exceeded the low likelihood of harm. To reach this argument, the trial court would have first made a preliminary finding of a change of circumstances per R.C. 3109.04(E)(1)(a). *Vent v. Vent*, 3d Dist. Wyandot No. 16-12-05, 2012-Ohio-5946, ¶ 31. "Having affirmed the trial court's threshold decision finding no change in circumstances, there is no need to examine whether

---

[2] Although the statute does provide that a change in the circumstances of the child may be the basis for finding a change of circumstance, the change must still be a material change. The trial court did not find that Jordyn's struggles in school were a material change.

or not a change of custody would be in the [child's] best interests." *Id*. Thus, the third assignment of error is overruled.

**{¶42}** Having found no prejudicial error in the particulars assigned and argued, the judgment of the Court of Common Pleas of Seneca County, Juvenile Division, is affirmed.

*Judgment Affirmed*

**SHAW, P.J. and PRESTON, J., concur.**

**/hls**