[Cite as *B.M. v. P.M.*, 2025-Ohio-1674.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY

| | | |
|---|---|---|
| [B.M.] | : | |
| | : | |
| Appellant | : | C.A. No. 30326 |
| | : | |
| v. | : | Trial Court Case No. 2019 DR 00639 |
| | : | |
| [P.M.] | : | (Appeal from Common Pleas Court-|
| | : | Domestic Relations) |
| Appellee | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on May 9, 2025

. . . . . . . . . . .

BRIAN A. SOMMERS and V. ELIZABETH FLYNN, Attorneys for Appellant

JAMES C. STATON, Attorney for Appellee

. . . . . . . . . . . .

HUFFMAN, J.

{¶ 1} Father (B.M.) appeals from a judgment modifying the parties' parental rights and responsibilities with respect to their minor child, V.M. The trial court designated Mother (P.M.) as the residential parent and legal custodian of V.M. and awarded parenting time to Father pursuant to the Standard Order of Parenting Time ("standard

order"). The trial court reasonably concluded that there had been a change in circumstances, that modification of parental rights and responsibilities was in the best interest of V.M., and that any harm resulting from the modification was outweighed by the advantages to the child. As such, the judgment of the trial court will be affirmed.

## Facts and Procedural History

{¶ 2} Mother and Father were married in 2015, and V.M. was born in 2017. The parties divorced in 2020. In the divorce, Father was designated as the residential parent and legal custodian of V.M., and Mother received supervised parenting time once a week. In 2022, via agreed entry, Mother's parenting time was changed to unsupervised parenting time pursuant to the standard order. In 2023, Mother filed an emergency ex parte motion for a change of custody, alleging the sexual abuse and neglect of V.M. Mother's ex parte motion was granted. After a full hearing, the magistrate recommended that Mother be designated the residential parent and legal custodian of V.M. and that Father receive parenting time pursuant to the standard order, with modifications.

{¶ 3} Father objected to the magistrate's decision, and Mother opposed the objections. The trial court overruled Father's objections and granted residential parent status to Mother. Father appeals, raising three assignments of error.

## Change of Circumstances

{¶ 4} In his first assignment of error, Father argues that the trial court abused its discretion in finding that a change of circumstances occurred warranting a modification in residential parent from him to Mother.

{¶ 5} Father argues that the bases for the alleged change in circumstances were

Mother's false allegations that there was black mold in his home, that V.M. was malnourished, and that Father committed domestic violence against his former girlfriend, J.S. According to Father, at the time of the full hearing, the mold issue had been remedied, he no longer resided in the home at issue, and his new residence had passed a Veterans Affairs inspection. He argues that Mother had not expressed concern regarding V.M.'s health prior to pursuing the change of residential parent. Finally, Father asserts that he was never convicted of domestic violence and that J.S. had not resided with him since before Mother obtained emergency custody.

{¶ 6} By way of background, and before addressing this assigned error, we will review the evidence adduced at the hearing and the trial court's conclusions.

Hearing

{¶ 7} The following evidence was adduced at the hearing on February 9, 2024. Alonna Smith, of the Montgomery County Domestic Relations Court, Family Relations Division, completed and submitted a Family Investigation Report ("the report") as ordered by the magistrate. Mother alerted Smith to the presence of suspected black mold in Father's house after she helped father's ex-girlfriend, J.S., move from the home. Mother provided Smith with a video that reflected a black substance coming from the ceiling down the living room walls and coming up from the floor to the windows in the living and dining area; there was also a hole in a bedroom wall with visible dry rot.

{¶ 8} After viewing the video, Smith investigated Father's rental home on November 29, 2023. She reported that it was unkempt, unclean, and cluttered and that a damp smell permeated the entire home. V.M.'s room contained a toddler bed that

appeared to be too small for her, and there was a queen-sized mattress against a wall. Smith was concerned the mattress could pose a risk to V.M. The room contained very little furniture, and the carpeting was stained. The bathroom was unsanitary, with a stained sink and what looked like mold on the inside of the tub, on the wall, and in the grout. Walls in the home appeared to have been patched and/or painted, with furniture placed to further conceal stains from the mold. Smith did not believe the home to be safe or appropriate based upon its condition. She was further concerned that Father's new girlfriend of two months, K.G., was living in the home and was not on the lease.

{¶ 9} Smith reviewed work orders and maintenance reports done for the home by property management from October to December 2023. One indicated the presence of "biological growth" and stated that Father had advised that the problem was resolved, but a subsequent order indicated that the substance was still present. Faith Environmental Janitorial Services was the assigned vendor for the problem. Loose tile and grout were noted in the bathroom, as well as missing caulk in the tub area, and drywall was replaced. A large structural crack in the ceiling was indicated, and the roof and siding were replaced due to leaking.

{¶ 10} Smith was concerned that none of the work orders mentioned mold remediation. A Certification of Mold Clearance from Faith Environmental Janitorial Services indicated that an inspection and service for microbial growth were performed on December 12, 2023. The inspection showed that leaks were the cause of the non-toxic "fungi" and that the home passed a visual inspection for microbial growth. The certification did not alleviate Smith's concerns about mold. While Father related to Smith

that his landlord had advised him that he would move Father to a new residence within three to six months, Father provided no documentation in support of his assertion.

{¶ 11} Smith was also concerned that, while in Father's care, V.M. was performing below grade level. The child was not on an Individualized Education Plan ("IEP") at the time. Smith also factored into her report an allegation of domestic violence between Father and J.S. and that J.S. had obtained a restraining order against Father.

{¶ 12} Mother testified that, in addition to V.M., who was born in 2017, she had custody of two other daughters, born in 2007 and 2009, and all three children shared a close bond. Mother, the children, and Mother's fiancé resided in Huber Heights, and V.M. attended the same elementary school she had attended when she resided with Father. Mother had been able to obtain an intradistrict waiver to allow V.M. to remain at the same school, despite the fact that Mother lived in another elementary school district. While V.M. was in Father's care, he did not deny Mother parenting time.

{¶ 13} Prior to obtaining temporary custody, Mother was not as involved with V.M.'s schooling as she would have liked due to Father's interference. V.M. started kindergarten after the parties' divorce, in August 2022. Mother attempted to set up a parent teacher conference that year, and Father sent her a message on AppClose, a co-parenting application, stating that she could not do so because he was the residential parent. He failed to respond to other requests about the child's schooling. Mother scheduled a parent teacher conference the following year and learned that V.M. was behind in reading and mathematics and struggling to hold a pencil properly. V.M.'s teacher suggested an IEP, and a meeting on the issue was scheduled for February 12,

2024. Mother was working with V.M. for an hour after school each day on reading, writing, and math.

{¶ 14} After speaking to V.M.'s guidance counselor, Mother had recently enrolled V.M. in therapy with Sondermind, an entity that provides services at V.M.'s school. While Mother never attended previous medical appointments for the child because Father did not tell her about them, Mother had scheduled an upcoming wellness check for V.M.

{¶ 15} Mother was concerned about V.M.'s weight, noting that the child's medical records reflected that she had not gained any weight over a period of several months from August 2023 to January 2024. Mother imposed a structured food schedule for V.M., including dinner every night between 5:00 and 6:00 p.m., with servings of a protein, a starch, and a vegetable, and dessert on Fridays. V.M. also had a structured bedtime routine.

{¶ 16} Mother asked Father for V.M.'s dental records; he provided none and messaged her in AppClose that he did not recall the dentist's name. V.M. had an upcoming dental appointment scheduled.

{¶ 17} Mother was employed as a housing assistance clerk for Vinebrook Homes, making $18.75 per hour and working 40 hours a week from home. She received Veterans Affairs disability pay and informal child support from the fathers of her other daughters, and she obtained a family insurance plan through her work.

{¶ 18} Mother was concerned about alleged domestic violence between Father and J.S. when they resided together. She had not met Father's new girlfriend, K.G., or communicated with her in any way, and she was concerned about such a new girlfriend

providing care for V.M. if the child were to be returned to Father's custody.

**{¶ 19}** Mother had been diagnosed with major depression, anxiety, and agoraphobia, and she sought mental health treatment in March 2023. A psychiatrist prescribed her medication, and she saw a therapist weekly. Mother was taking eight medications at one point, although some had been changed or discontinued, so that she was taking four at the time of the hearing, only one of which was for mental health purposes, namely depression. None of the medications impeded her ability to function or care for V.M.

**{¶ 20}** Although she had been informed that Father planned to move, Mother did not know where he intended to live. She witnessed the mold problem on September 23, 2023, and she also noticed a damp, musty, moldy smell in Father's home. Mother became aware of the same smell on V.M.'s clothing twice after the child was with Father before the hearing. She had to wash the clothing and bathe V.M. to remove the odor.

**{¶ 21}** Mother acknowledged a January 29, 2024 "Alleged Child Victim Disposition Letter" from Montgomery County Children's Services ("MCCS"), indicating that an investigation into allegations of neglect and sexual abuse received from Mother on September 28, 2023, found those allegations to be unsubstantiated. Mother believed that the sexual abuse of V.M. by V.M.'s brother had occurred.

**{¶ 22}** Father's former girlfriend, J.S., testified that she had lived with Father for approximately four years, during which time she made the majority of medical appointments for V.M. with Father's approval. During that time, V.M. never had a dental appointment. J.S. testified that the appearance of mold was present in the home for

three years, and J.S. called property management to report it after she moved out of the home because Father would not allow her to do so while she lived with him.

{¶ 23} The hearing continued on March 29, 2024. C.R., Father's stepmother, testified that she lived with Father's mother, and since J.S. moved out, they provided childcare for V.M. while Father worked. V.M. spent the night with them two or three times a week after J.S. moved out of Father's home.

{¶ 24} Father testified that he moved into his current home in February 2024. He had used his Veteran Affairs benefits to buy the property, and the three-bedroom home had passed inspection. Father had custody of V.M.'s brother, who was born in 2013. Father also had a daughter with J.S. who was born in 2021 and had lived with him until September 2023, when his relationship with J.S. ended.

{¶ 25} K.G., Father's girlfriend, also resided with Father, having moved into the home at the beginning of November 2023, approximately two months after J.S. moved out. According to Father, K.G. did not provide childcare because she and Father were usually together with the child and he provided care. Father claimed that Smith's statement in her family investigation report that K.G. or Father's mother provided childcare to V.M. and her brother if needed was incorrect. Father acknowledged that Smith noted "police involvement" in his history, but he again claimed the report was inaccurate and that he had never been convicted of domestic violence.

{¶ 26} Father testified that he had not consistently received his court-ordered parenting time since V.M. was placed in Mother's temporary custody. Mother denied his parenting time twice in 2024, advising him that he could not see the child until "an

investigation is complete." Father acknowledged that one day prior to the hearing, a petition for a protection order had been filed on behalf of his daughter with J.S. According to Father, J.S. made the same allegations that Mother previously made about sexual abuse. Father did not believe that if Mother received custody, she would facilitate parenting time or share medical information with him. He expressed concern about Mother's mental health and use of medications.

{¶ 27} Father acknowledged that Smith's report recommended that he seek counseling for V.M. He had not done so, but he had advised V.M.'s school counselor about what he described as "the big, big, life event change" that occurred when J.S. left. According to Father, a Montgomery County child services caseworker stated that she would send him a referral for a counselor, but he denied receiving a referral.

{¶ 28} According to Father, he was very involved with V.M.'s schooling prior to the temporary change in custody. Mother removed him as the primary contact for the school once she was granted temporary custody. According to Father, school personnel had not believed that V.M. needed an IEP prior to the award of temporary custody. At a 2023 spring conference, the IEP was mentioned. Father claimed that Smith's report was incorrect in reflecting that he told Smith V.M. was going to be placed on an IEP. In his view, Smith's report contained multiple errors.

{¶ 29} Father had been employed at Amazon for four years, making $22.50 an hour, with some overtime. He obtained insurance through his employment. Father worked overnight on Thursdays, Fridays, and Saturdays, and he was able to spend the remaining days of the week with V.M.

{¶ 30} Father acknowledged that, when they lived together, J.S. took V.M. to the majority of her doctor's appointments because she only worked a few hours a day. He had not scheduled or attended a dental appointment for the child. V.M.'s pediatrician never expressed concern about the child's weight, according to Father.

{¶ 31} Mother testified again at the conclusion of the hearing. She acknowledged that she had denied Father parenting time after she was awarded temporary custody due to concerns for V.M.'s safety. She believed that Father needed therapy and an anger management program, and she intended to continue to deny parenting time until children services completed an investigation of the recent allegations by J.S. In response, the magistrate strongly admonished Mother to comply with the order for Father's parenting time.

{¶ 32} After the hearing, the magistrate recommended that Mother be named the residential parent and legal custodian and that Father have parenting time pursuant to the standard order. Father objected to this decision.

Trial Court's Decision

{¶ 33} In overruling Father's objections, the trial court found a change of circumstances in Father's home that had existed for an extended period before Mother filed her custody motion, which included the mold. The court found it significant that Father had failed to address the deplorable conditions in his home while V.M. lived there, even though he had since moved. The court indicated that Father only chose to address the issue due to Mother's emergency motion for custody, and it found that a change of circumstances had occurred warranting a best interest analysis.

**{¶ 34}** The court further concluded that while Father had been in a relationship with J.S., she was the primary care giver for V.M. due to Father's work schedule; after the relationship ended, Father arranged V.M.'s care with family members. The trial court found that Father had prevented Mother's involvement in the child's education, failed to take the child to the dentist, and failed to take her to counseling as recommended by children services.

**{¶ 35}** The court determined that V.M. was bonded with Mother's other two children and that Mother was able to modify her work schedule to meet V.M.'s needs since she worked from home. The court found Mother provided a structured schedule and support through the IEP, a clean home, and healthy food options for V.M. The court further determined that Mother appeared to be maintaining her mental health and following the instructions of medical personnel. Given that V.M. was doing well in Mother's care, the court concluded that any harm to V.M. due to the change of environment was outweighed by the advantages of the change.

**{¶ 36}** "R.C. 3109.04 governs the domestic relations court's allocation of parental rights and responsibilities and sets forth the procedures and standards courts are to use in proceedings pertaining to such matters." *Hanna v. Hanna*, 2008-Ohio-3523, ¶ 10 (10th Dist.), citing *Braatz v. Braatz*, 85 Ohio St.3d 40 (1999). In relevant part, the statute states:

> The court shall not modify a prior decree allocating parental rights
> and responsibilities for the care of children unless it finds, based on facts
> that have arisen since the prior decree or that were unknown to the court at

the time of the prior decree, that a change has occurred in the circumstances of the child, the child's residential parent, or either of the parents subject to a shared parenting decree, and that the modification is necessary to serve the best interest of the child. In applying these standards, the court shall retain the residential parent designated by the prior decree . . . unless a modification is in the best interest of the child and one of the following applies:

. . .

(iii) The harm likely to be caused by a change of environment is outweighed by the advantages of the change of environment to the child.

{¶ 37} The phrase "change of circumstances" is not defined by statute but "has been held to pertain to an event, occurrence, or situation which has a material effect upon the child." *S.P. v. M.G.*, 2023-Ohio-2084, ¶ 16 (2d Dist.), citing *In re I.E.*, 2020-Ohio-3477, ¶ 15 (2d Dist.). " 'A change of circumstances must be one of substance, not slight or inconsequential, to justify modifying a prior custody order.' " *Id.*, quoting *Davis v. Flickinger*, 77 Ohio St.3d 415, 418 (1997). "In determining whether a change in circumstances has occurred so as to warrant a change in custody, a trial judge, as the trier of fact, must be given wide latitude to consider all issues which support such a change." *Davis* at paragraph two of the syllabus.

{¶ 38} " 'The clear intent of [the] statute is to spare children from a constant tug of war between their parents who would file a motion for change of custody each time the parent out of custody thought he or she could provide the children a "better"

environment.' " *S.P.* at ¶ 17, quoting *Steele v. Steele*, 2021-Ohio-3697, ¶ 24 (2d Dist.). "The purpose of requiring a finding of a change in circumstances is to prevent a constant relitigation of issues that have already been determined by the trial court." *Brammer v. Brammer*, 2011-Ohio-2610, ¶ 17 (3d Dist.), citing *Clyborn v. Clyborn*, 93 Ohio App.3d 192, 196 (3d Dist. 1994). "Therefore, the modification must be based upon some fact that has arisen since the prior order or was unknown at the time of the prior order." *Id.*, citing R.C. 3109.04(E)(1)(a).

{¶ 39} We review the determination of whether a change of circumstances has occurred for abuse of discretion. *S.P.* at ¶18. " 'Abuse of discretion' has been defined as an attitude that is unreasonable, arbitrary, or unconscionable." *AAAA Ents., Inc. v. River Place Community Redevelopment Corp.,* 50 Ohio St.3d 157, 161 (1990), citing *Huffman v. Hair Surgeon, Inc.*, 19 Ohio St.3d 83, 87 (1985). "It is expected that most instances of abuse of discretion will result in decisions that are simply unreasonable, rather than decisions that are unconscionable or arbitrary." *Id.* "A decision is unreasonable if there is no sound reasoning process that would support that decision." *Id.*

{¶ 40} Based on our review of the record, the trial court did not abuse its discretion in concluding that a change of circumstances had occurred. In his own testimony, Father stated that he had expressed concern to V.M.'s school counselor about the "big big life event change" that occurred when J.S. left. Thereafter, C.R. and Father's mother assumed childcare responsibilities for V.M. while she was with Father, with the child spending three nights a week in their home as opposed to Father's home. Father's

romantic relationship with K.G. began in October 2023, shortly after his relationship with J.S. ended. K.G. moved into Father's home right before Thanksgiving 2023. Given J.S.'s caregiver role, the trial court might have found a change of circumstances on the basis of Father's rapid change in relationships alone. Mother expressed concern about K.G. because she never met or communicated with her.

{¶ 41} Further, the trial court reasonably concluded that deplorable conditions at Father's home existed for months before Father addressed them, and he apparently only did so in response to Mother's motion for custody. The work order and maintenance records for the home, about which Smith testified, further established that Father was dilatory in addressing the issue. For these reasons, the trial court also could have reasonably found a substantial change in circumstances (of Father's own making).

{¶ 42} Father's first assignment of error arguing that the trial court abused its discretion in finding a change of circumstances is overruled.

### Best Interest

{¶ 43} We will next consider Father's third assignment of error, in which he argues that the trial court failed to consider V.M.'s best interest and the bond between him and the child when granting him parenting time. According to Father, the court's order created a "drastic change" for V.M., who was accustomed to seeing Father and her siblings every day. He asserts that an abuse of discretion is demonstrated in the court's failure to consider his plan of care for V.M.

{¶ 44} R.C. 3109.04(F)(1) sets forth the applicable factors for determining a child's best interest once a change in circumstance has been established. These encompass

all relevant factors, including but not limited to the wishes of the child's parents regarding the child's care; the child's interaction and interrelationship with the child's parents, siblings, and any other person who may significantly affect the child's best interest; the child's adjustment to the child's home, school, and community; the mental and physical health of all persons involved in the situation; the parent more likely to facilitate court-approved parenting time rights; and whether the residential parent has continuously and willfully denied the other parent's right to parenting time in accordance with an order of the court. "No single best interest factor is controlling, and the weight to be given to each factor is within a trial court's discretion." *In re K.L.,* 2023-Ohio-3910, ¶ 22 (2d Dist.).

{¶ 45} Based upon the evidence presented at the hearing, the trial court did not abuse its discretion in concluding that a modification of parental rights and responsibilities was in V.M.'s best interest. While each parent sought to be designated as the residential parent, we find that the trial court reasonably evaluated their competing strengths and interests. The record reflects that the child was bonded to both parents and her siblings. Regarding Father's new girlfriend, K.G., the report stated that when she was asked how she would feel if V.M. lived in Father's home with them, K.G. stated, "I think it's a problem"; she then said she did not mean to make that statement, and instead said, "all I will say is he's a good dad and I'll leave it at that." Smith, who prepared the report, indicated in the report that K.G. "did not come across as truthful."

{¶ 46} The record also supports the trial court's conclusion that V.M. was adjusted to her home and school. Mother was involved with V.M.'s education, consistently working with her in the areas where she was lagging academically. While in Mother's

care, V.M. was placed on an IEP, and Mother was able to keep V.M. in the same school as when she resided with Father. Mother was able to be at home with V.M. each week and to adapt her work schedule to meet V.M.'s needs, so that V.M. did not have to go elsewhere for childcare. The report noted that Mother's home was tidy, with an adequate supply of food. The trial court found that Mother's schedule was structured, her home was clean, and she provided nutritious meals for her children.

{¶ 47} Father expressed concerns about Mother's mental health, asserting that her use of medications appeared inconsistent. Despite Father's speculation, the record reflects that Mother was taking her medications as prescribed and was in weekly therapy. The trial court reasonably concluded that Mother's mental health appeared to be stable. This was especially reflected in the care she provided for V.M.

{¶ 48} Finally, it was undisputed that Father did not interfere with Mother's parenting time and that Mother denied Father parenting time twice after she obtained temporary custody. This factor is somewhat concerning, and the magistrate strongly admonished Mother to facilitate Father's parenting time going forward. However, no one factor is controlling, and the balance of the applicable factors overwhelmingly favored awarding custody to Mother. Based upon the foregoing, and because an abuse of discretion is not demonstrated, Father's third assignment of error is overruled.

### Weighing Harm and Advantages of Change in Custody

{¶ 49} Finally, we will address Father's second assignment of error. He argues that the trial court abused its discretion in determining that any harm to V.M. from the change of custody was outweighed by the advantages to the child. Father argues that

Mother and J.S. conspired against him. He asserts that he has always been V.M.'s primary care giver. According to Father, the magistrate improperly discounted his evidence in designating Mother as the residential parent, including the certification of mold clearance issued for his home.

{¶ 50} Father's assertion that Mother and J.S. conspired against him is merely speculative. While it is true that Father served as V.M.'s legal primary caregiver until the grant of temporary custody to Mother, he did so in a home with deplorable conditions. There was also evidence that J.S. provided a substantial amount of care for V.M., while Father did not adequately attend to her medical or school needs. The mold clearance was based upon a visual inspection and, contrary to Father's assertion, the trial court did not improperly discount his evidence. The record reflects that V.M. was well cared for by Mother and, as the trial court found, any harm likely to be caused by awarding Mother legal custody was outweighed by the advantages to V.M. Accordingly, Father's second assignment of error is overruled.

{¶ 51} Having overruled Father's assignments of errors, the judgment of the trial court will be affirmed.

. . . . . . . . . . . .

EPLEY, P.J. and HANSEMAN, J., concur.